## No. 11,640.

## GERTNER v. LIMON NATIONAL BANK.

Decided June 6, 1927.  Rehearing denied June 27, 1927.

Action to foreclose deed of trust as a mortgage. Decree for plaintiff.

### *Modified and Affirmed.*

1. COMPROMISE AND SETTLEMENT—*Burden of Proof.* In an action to foreclose a mortgage, defendant had the burden of proving the allegation of her cross-complaint that the mortgage indebtedness was to be fully discharged upon payment to the creditor of a smaller sum than the principal indebtedness.

2. EVIDENCE—*Burden of Proof.* The burden of proof lies upon the party who substantially asserts the affirmative of an issue.

3. APPEAL AND ERROR—*Sufficiency of Evidence.* Where the facts entitle a party to relief and the evidence is undisputed, a judgment based thereon will not be disturbed on review.

4. *Conflicting Evidence.* A judgment will not be reversed solely on the ground of conflicting evidence.

5. *Sufficiency of Evidence.* A verdict or finding of the trial court which is so manifestly against the weight of the evidence as to result in a miscarriage of justice, is not necessarily binding upon a court of review.

6. *Sufficiency of Evidence.* If a verdict or finding is not against the weight of the evidence and will not result in a miscarriage of justice, no occasion is presented for the Supreme Court's interference.

7. *Conflicting Evidence.* Fact findings of the trial court based on conflicting evidence will not be disturbed on review.

8. CONTRACTS—*Construction.* To ascertain one's meaning expressed in letters leading up to a contract, disjointed words, sentences or parts of sentences must not be taken, but the context must be considered.

9. PLEDGE—*Note—Collateral Security.* The holder of a note or security has a right to sue upon it even though it is held as collateral to another.

10. CONTRACT—*Consideration.* A valid consideration may consist of a benefit to the promisor or a detriment or disadvantage to the promisee.

11. MORTGAGE—*Assumption—Consideration.* Reduction of the amount of a mortgage lien and extension of time for payment of balance due held a valid consideration for the assumption of an encumbrance.

12. CONTRACT—*Modification—Consideration.* In this case, no new consideration was required for a modified contract, there being a consideration for the original.

13.     *Modification—Consideration.* A promise for a promise is a valid consideration for the modification of a contract.

14. FRAUD—*Pleading and Proof.* Charges of fraud in a real estate transaction must be pleaded and sustained by clear and convincing proof.

15.     *Mortgage.* Defendant, purchaser of land, held not to have been defrauded where he expressly chose to take a deed rather than a first trust deed thereon to secure money advanced, as recommended by plaintiff bank.

16.     *Mortgage.* Failure of a mortgagee to return money to a purchaser of land, the money being used to reduce the indebtedness thereon, held not to have been a fraud on the purchaser where the latter neither requested nor desired its return.

17. CONTRACT—*Mortgage—Fraud—Cancellation.* A decree cancelling a contract for fraud will not be entered unless the parties can be placed substantially in statu quo.

18. PLEADING—*Contract—Cancellation.* Complaint for cancellation of a contract must ordinarily allege a return or an offer to return whatever plaintiff received under the contract.

19. CONTRACT—*Modification by Courts.* It is the duty of courts to interpret contracts as made by the parties, and not to make new ones for them.

20.     *Court Relief.* Courts do not open their doors to those who are suffering merely from their own bad bargains not induced by any misrepresentations.

21. MORTGAGE—*Foreclosure—Attorney Fee.* In an action to foreclose a mortgage, although the note called for allowance of attorney fees, they should not be awarded in the absence of proof concerning them.

*Error to the District Court of Cheyenne County, Hon.
Wilbur M. Alter, Judge.*

Messrs. KLOCKENTEGER & MAGEE, Messrs. ALLEN, WEBSTER & DRATH, for plaintiff in error.

Mr. RALPH McCRILLIS, Mr. ROBERT H. SCHAPER, for defendant in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

THIS is a suit brought by defendant in error, The Limon National Bank, plaintiff in the district court, against Gertner and others, to foreclose a deed of trust as a mortgage. Findings, judgment and decree for plaintiff. Defendant, Mrs. Gertner, brings the case here for review. When not otherwise designated, we shall refer to the bank as plaintiff, and to Mrs. Gertner as defendant, their respective positions in the trial court.

The trust deed that was foreclosed is dated March 30, 1920; it was executed by two of the other defendants, Oscar J. Ewy and his wife, Marie J. Ewy, to the public trustee in Cheyenne county, Colorado, to secure their note in the principal sum of $20,000, of even date therewith, due in two years, in favor of the Limon Cattle Loan Company. The trust deed covers two sections of land in Cheyenne county, containing 1,280 acres, more or less, and was recorded in that county on April 20, 1920. A credit of $14,800 is endorsed on the note, and the balance alleged to be due is the sum of $5,200 principal, besides accrued interest and attorney's fees. Plaintiff, The Limon National Bank, was the holder and owner of the note at the time of the commencement of the action. The parties defendant are Mr. and Mrs. Ewy, who executed the note and trust deed, Barbara Gertner, the present record owner of the land, and lastly, the public

trustee in Cheyenne county, the trustee named in the deed of trust. The Ewys defaulted and the public trustee confessed the bill. The defendant Barbara Gertner is the only one that assigns error and that is before us complaining of the decree of foreclosure.

The genuineness and due execution of the note and trust deed are admitted. The sole defense is that a payment of $14,411.70, made by one Gottlieb Gertner on or about November 22, 1922, should be accepted in full payment and discharge of the twenty thousand dollar lien. On November 11, 1922, Ewy and his wife, at that time owners of the land in question, deeded it to Gottlieb Gertner, subject to certain encumbrances named, containing the words, "which second party (Gertner) assumes and agrees to pay." Gertner is now deceased. He owned the land when he died and the defendant Barbara Gertner is his widow and sole heir. She contends that the land is in fact free and clear of all liens and encumbrances, and that the bank or loan company should have executed a full release, and therefore that plaintiff has no right of foreclosure.

An acquaintance with the personal relations of the parties between themselves may help somewhat to a better understanding of the case. The Gertner and Ewy family ties are very close. Mrs. Ewy was brought up in the Gertner home in Minnesota, and was looked upon by Mr. and Mrs. Gertner as their own child; they are referred to by the parties as Mrs. Ewy's foster parents, and as "mother" and "father" by the Ewys themselves. These intimate relations did not cease when Gottlieb Gertner died. This is apparent from the fact that after his death, his widow, the defendant Barbara Gertner, came to Colorado and made her home with her foster children, the Ewys, who reside on the land in dispute. The Ewys have continued to remain on the land, notwithstanding its sale to Gottlieb Gertner. The parties agree that Mrs. Ewy will inherit Mrs. Gertner's estate upon the latter's demise.

The Limon Cattle Loan Company is a Colorado corporation. Its officers are officially connected with the plaintiff, The Limon National Bank. They worked together, and as to the matter here involved, their rights and duties are identical. For such purposes, and with the consent of plaintiff and defendant, we shall treat the loan company and the bank as substantially the same concern, to save time. We shall use their names separately, together, or interchangeably, as occasion may require, but in every instance it will have reference to the rights and duties of the plaintiff, The Limon National Bank.

For several years prior to and including the year 1920, the bank and loan company had been carrying cattle loans for the defendants Mr. and Mrs. Ewy. Some, at least, were secured by chattel mortgage. These loans ran as high as $34,000, and the loan company required the Ewys to give additional security. This resulted in the execution of the deed of trust on March 30, 1920, to secure the sum of twenty thousand dollars, which was later foreclosed for the unpaid balance in the suit we are now considering. This trust deed is referred to by some of the witnesses as "collateral security" to the larger indebtedness of the Ewys to the bank or loan company.

In 1922, the loan company insisted that the Ewys reduce their indebtedness. They had no money, and no place to look for it unless Mrs. Ewy's foster father, Gottlieb Gertner, then living in Minnesota, could be induced to come to their rescue. After talking with representatives of the bank and loan company, Mr. and Mrs. Ewy went back to Minnesota about October 10, 1922, for this purpose. At this point the dispute begins. Defendant claims, and the Ewys so testified, that the bank or loan company agreed to fully cancel their $20,000 lien on the land in question, if the Ewys would sell the land to Gottlieb Gertner for $14,500, and apply the amount thus received in reduction of the Ewy indebtedness to the

bank and loan company, but in any event, it would not, defendant says, be a further charge on the land, so her deceased husband would have acquired the premises free and clear of all liens and encumbrances. Mrs. Ewy admits that she said nothing to her foster father about the $20,000 encumbrance, but gave him to understand that the land could be bought clear for $14,500. Mr. Ewy did not talk with Mr. Gertner. Mrs. Ewy persuaded Gertner to get the money for them, and one A. F. Meyer, cashier of Westbrook National Bank, of Westbrook, Minn., Mr. Gertner's business advisor and agent, negotiated a loan for the latter on some Minnesota land that he owned, and realized $14,500 from it. Meyer transmitted $14,411.70 of the amount to The Limon National Bank, the difference having been deducted by him to pay for recording fees and other expenses connected with the Minnesota loan. The Limon bank placed the money to the credit of Ewy's checking account, but eventually endorsed a credit of $14,800 on the Ewy $20,000 note. We assume that the amount in excess of the sum received from Minnesota, that went to make the total of $14,800 credited, was paid by the Ewys. There is no dispute over these minor differences.

Plaintiff's version of the affair is different from defendant's in essential particulars. Plaintiff admits that the Ewys went back to Minnesota to get money, if they could, from Gottlieb Gertner, with plaintiff's knowledge, but denies that the bank or loan company agreed to fully cancel the $20,000 lien for the sum of $14,500. Plaintiff says that they did not then know, nor did anyone know at the time, what amount of money, if any, the Ewys would be able to get, and that no definite arrangement was made before they went east as to how the security should be adjusted; that the bank or loan company was willing to give Gottlieb Gertner, and did give him, his choice of one or two alternatives; i. e., that the bank would either turn over to Gertner a first trust deed on the land in the sum of $14,500, the title to the

land in such case to rest in Oscar Ewy and his wife, or else let the title be in Gertner, and credit the trust deed down to $5,200. The bank was then carrying some "plain notes" of Ewy's, for which they explained they wanted some semblance of security. D. W. Wills, secretary of the loan company, and an officer of the bank, testified that if the Ewy's had kept the land and if Gertner had been given a first trust deed, it would have thus enabled the bank to take a second mortgage or trust deed for the balance. Wills also explained in a letter to Meyer that with Ewy owning the land, the latter could make a better showing than as a renter, and yet Mr. Gertner would be fully protected. The loan company expected the Ewys to pay out on their cattle; the Ewy paper was extended to give them a chance, but the bank or loan company was not willing in view of the Ewys' precarious financial condition, to surrender all of their land security, and permit the Ewys to transfer this Colorado land clear of encumbrances to their foster father in Minnesota. As Wills testified: "We did not do business that way."

The further position of the plaintiff is that after considerable correspondence between the loan company and Meyer, in Minnesota, representing Gertner, the latter chose the second alternative; namely, that the title to the land should rest in Gertner, subject to a first trust deed in favor of the loan company to secure the $5,200 balance due, and that such was the situation when the foreclosure suit was begun.

It is further shown, that after the transaction between plaintiff and Gottlieb Gertner was closed, and while the title to the land was vested in Gertner's name, both Mr. and Mrs. Ewy went through bankruptcy. The lien of the trust deed was too old to be affected by that adjudication, and was not there involved, but the bankruptcy proceeding enabled the Ewys to obtain a discharge of their personal debts. The bankruptcy matter is not disputed. When this suit was commenced, the

Ewys owed the bank or loan company more than the $5,200, interest and fees, claimed under the foreclosure.

It seems that the loan company neglected to execute even a partial release of record, but has not refused to do so to the extent of the payment made, nor has it failed to give credit for the payment. The plaintiff bank does not challenge Mrs. Gertner's right to redeem from the foreclosure sale within the time and in the manner provided by law, upon payment of the balance found to be due.

A. F. Meyer, the Minnesota representative of Gottlieb Gertner in his lifetime, testified for plaintiff. It was shown by him that various letters passing between Meyer and the loan company were written under Gottlieb Gertner's direction; that Meyer talked the matters over with him before the letters were sent; that the deed from the Ewys to Gottlieb Gertner was intended as security for a loan of $14,500, and that the arrangement which was finally made on the transaction was agreeable to Mr. Gertner. Meyer was further interrogated: "Q. And at whose direction was it that the transaction was finally closed leaving a balance of $5,200 on the sections one and eleven involved here? A. Mr. Gertner's." No error is assigned by either party upon the admission or rejection of evidence.

We give here in chronological order and as briefly as the case warrants, a resumé of the correspondence in evidence. The letters signed by Wills were written upon behalf of plaintiff; those by Meyer or the First National Bank of Westbrook, Minn., were for Gottlieb Gertner, defendant Mrs. Gertner's deceased husband. We give these letters arbitrary numbers, for convenient reference, regardless of who introduced them, following a similar plan in defendant's brief as to most of them. We remark in advance that the majority of the court regard the earlier part of the correspondence as of minor importance now, they being merely negotiations leading up to, and having been merged in the final agree-

ment between the parties, evidenced by the last letters, like usual business correspondence when parties are trying to get together and finally do so. For this reason we would not quote them at length, except for the fact that some of the members of the court have construed them differently than have the majority of us. The full correspondence does help to an understanding of the case from the ground up, and can be more quickly grasped by adopting the excellent arrangement of counsel for defendant.

First letter: Date, October 20, 1922, from A. F. Meyer, Cashier First National Bank, Westbrook, Minn., to The Limon National Bank, Limon, Colo. It reads:

"Mr. Oscar J. Ewy was in today relative to the mortgage on his 1,280 acres, which he says is due.

"We have today taken an application from Gottlieb Gertner, on his half section of land here, and we are sure that the same will be approved. We will know within a week if the loan will be accepted, having made it with the Joint Stock Land Bank.

"Mr. Gertner figured that he could save Mr. Ewy a considerable amount of interest by making the loan on his land here and taking up the mortgage at your bank.

"Trusting this will meet with your entire satisfaction, I am,

Very truly yours,
A. F. Meyer, Cashier."

Second letter: November 6, 1922, from The Limon National Bank to A. F. Meyer, Cashier. It reads:

"Under date of October 20th, you wrote us advising that Gottlieb Gertner had made application for a real estate loan to take up the Oscar J. Ewy mortgage we hold. We would be interested to know how this matter is coming along and would be glad to have a line from you."

Third letter: November 10, 1922, from Meyer to The Limon National Bank, which reads:

"Replying to your letter of the 6th instant, will advise that the Gottlieb Gertner loan has been approved but not closed. They are now examining the title and as soon as that is found in order, I am sure the loan will be closed within ten days. The Federal Joint Stock Land Banks are a little slow. However, as the loan has been approved, you may rest assured that Mr. Ewy will be able to take up the mortgage you are holding."

Fourth letter: November 23, 1922, from Meyer to The Limon National Bank. It reads:

"We are herewith enclosing our cashier's check No. 18384 for $14,411.70, payable to Oscar J. Ewy, with the understanding that the mortgages aggregating $14,350.00 covering Sections 1 and 11, Township 12, Range 50, be satisfied and the satisfaction placed of record. Will you kindly see to this and send us the old mortgages, notes and abstract covering Mr. Ewy's land in Cheyenne County?

"Kindly acknowledge receipt of the enclosed and oblige."

Fifth letter: November 28, 1922, from D. W. Wills of The Limon National Bank to First National Bank, Westbrook, Minn., which reads:

"We are in receipt of your letter of the 23rd, inclosing your cashier's check for $14,411.70 and thank you for the same. The release and abstract will be forthcoming very shortly."

Sixth letter: Written on the same day as No. 5, November 28, 1922, from D. W. Wills to Oscar J. Ewy. The letter reads:

"We hand you herewith duplicate deposit ticket for $14,411.70, being the amount sent to us for your credit by the First National Bank of Westbrook, Minnesota.

"We are today sending for your papers and will have them released as per their request and forward them to them, or to you, whichever you desire. I believe you

were to make a deed to them. We will prepare this deed for you if you have not already made one and send it to you for your signatures. Let us know about this.''

Seventh letter: December 6, 1922, from Mrs. Oscar Ewy to Dave Wills:

''Received your letter a few days ago, in regard to that deed, we made one out to Father while we were home, so that is all settled. * * *''

Eighth letter: March 21, 1923, from A. F. Meyer to Oscar J. Ewy, with endorsement thereon from Mrs. Ewy to Wills:

''After we sent the money to the bank there and had the deed recorded, I believe it was the understanding that Mr. Gertner should have the satisfaction of mortgages on the two sections, and also the abstract.

''Mr. Gertner was in yesterday asking if we had received the papers. I said that we had not, and no doubt, you had the abstract and the old mortgages. I wonder if it would be satisfactory to you to have them sent here for examination. The abstract Mr. Gertner will hold.

''Assuring you that this favor will be appreciated, I remain with kind and personal regards to yourself and Mrs. Ewy.

Very truly yours,
A. F. Meyer, Cashier.''

''Dear Friend Mr. Wills:

''Will you please see that the old mortgage paper and abstract is sent to Mr. Meyers at Westbrook at once, as my Father has asked for same.

''Thanking in advance,
Yours truly,
Mrs. O. J. Ewy.''

Ninth letter: March 29, 1923, from A. F. Meyer to Oscar J. Ewy:

''I received a letter from the Register of deeds at Cheyenne Wells, stating that there appears to be $20,000

of mortgages against Sections 1 and 11 in Township 12, Range 50, being the land you deeded to Mr. Gottlieb Gertner.

"I was very surprised to find so great an amount against the land. I was under the impression that when Mr. Gertner made the loan which we sent to the bank out there, the mortgages would be cleared off the records, and I am merely calling your attention to this, thinking that perhaps you were under the impression that the mortgages had been released. You had better go and see about it at once. This will be a protection against you as well as Mr. Gertner. The deed you and Mrs. Ewy gave to him was to be clear of all encumbrance.

"As yet I have said nothing to Mr. Gertner about the mortgages as it might worry him, and I wanted to hear from you first.

"Kindly write me and also send the old mortgages and recorded satisfaction with the abstract.

Very truly yours,
A. F. Meyer, Cashier."

Tenth letter: April 5, 1923, from the Limon Cattle Loan Company to A. F. Meyer. The letter is as follows:

"We have been expecting to take the matter of Mr. Ewy's land up with you and Mr. Ewy for some time, but it has just been overlooked. It seems that Oscar misunderstood us in making this deal. We, of course, are perfectly willing to turn you a first deed of trust on this land in the sum of $14,500 as of December 1, 1922, but we want the title to this land to rest in Oscar and his wife, as we are still carrying some plain notes for Oscar and it is necessary that we have some semblance of security, and believe when you fully understand the situation, you will have no trouble in settling the matter, and with this in view we are enclosing herewith warranty deed from Mr. Gertner to Oscar J. and Marie Ewy, covering Sections 1 and 11, and we are asking you to mail this deed back to Oscar and upon receipt of same, we will turn over to you the deed of trust for the full amount

of your indebtedness, which will recite interest from December 1, 1922, at eight per cent.

"It is no desire of ours to cause you or Mr. Gertner any inconvenience or worry regarding this, but you as a banker can readily understand we should have some sign of security in order to carry this paper in our bank, and while we realize the $14,500 would cover a big portion of Oscar's equity in this land, yet on the other hand, he can make a better showing than a renter and yet Mr. Gertner would be fully protected.

"Oscar did not understand the situation fully I am sure, and had no intention whatever of misleading Mr. Gertner and the same is true of ourselves, except that we did not realize that Oscar was going to deed this land to Mr. Gertner. We want everybody entirely satisfied, and if this arrangement is not satisfactory, kindly tell us what are your wishes in the matter.

"After writing the above, Oscar advises that he does not believe the original deed from himself and his wife has been recorded and if this is the case, all that is necessary to be done is to return the deed of Oscar and he will bring it to us and exchange it for this deed of trust, or you may send it to us direct.

"As a further explanation would say that our deed of trust stands as $20,000. We, of course, would want to credit on the back of this note amounting to $5,500 and credit the interest as being paid to December 1, 1922, and endorse the note to you without recourse.''

Eleventh letter: April 19, 1923, from Meyer to Wills:

"I have your letter of April 5th and expected writing you before but was unable to talk to Mr. Gertner.

"I am having quite a time getting Mr. Gertner to understand the meaning of a trust deed. At the time Mr. and Mrs. Oscar Ewy executed the deed in his favor, Mr. Gertner understood that by paying your bank $14,500 Sections 1 and 11 would be clear of all encumbrances. I am sure that Oscar said nothing to him about the $5,500 indebtedness.

"Now what I would like to have you do is this: Send us a copy of the trust deed executed by Oscar and his wife in favor of your bank, and also a copy of the note which I presume accompanies the deed. Upon receipt of same I will again talk to Mr. Gertner and see if I can persuade him and his wife to turn back the land to Mr. and Mrs. Ewy.

"I believe you will be perfectly safe in carrying Oscar's note for $5,500 provided Mrs. Ewy will sign it. I am very familiar with Mr. Gertner's transactions, and confidentially want to say that all the property belonging to him will some go to Mrs. Ewy. He has a half section of land in this county worth at least $50,000, and Sections 1 and 11 will go back to Mrs. Ewy, as she appears to be the only heir. So I am sure you will be perfectly safe, and I think this matter can be satisfactorily settled.

"This transaction is worrying Mr. Gertner considerably. It is too bad that this misunderstanding occurred.

"Hoping that you will be able to comply with our request, I am,

Very truly yours,
A. F. Meyer, Cashier."

Twelfth letter: April 23, 1923, from Wills to Meyer:

"Replying to yours of the 19th, we are sorry indeed that any misunderstanding should have occurred, and of course want to do all we can to satisfy Mr. Gertner. As per your request, we enclose copy of deed of trust and note secured by Sections 1 and 11 for $20,000. Since writing you, the $5,500 note held by us from Oscar and his wife has been reduced to $5,200 and interest paid up to time of renewal. We did this by putting more indebtedness on his cattle and reduced the unsecured loan.

"If it would be easier to explain to Mr. Gertner, we would be glad to let the title still rest in Mr. Gertner to this land and credit the deed of trust down to $5,200, but rather imagine it would suit him better to hold a first

lien of $14,500 himself, than for us to hold it. We can endorse this paper without recourse and let him hold it until he is paid.

"I am sure that Oscar had no intention of misstating the facts to Mr. Gertner and that it was only a misunderstanding between Oscar and myself. If the cattle market continues the way it has this year, it will not take Oscar very long to make up his deficiency as we feel the cattle he has now carry a big margin of profit, and while we have never expected to lose any money on Oscar's deal, at the same time a loan of $5,200 to $5,500 unsecured, does not look very well.

"We hope that the matter can be explained to Mr. Gertner to his entire satisfaction, and believe that he will eventually realize our position.

Yours very truly,<br>D. W. Wills, Secretary."

Thirteenth letter: April 26, 1923, from Meyer to Wills:

"Your letter of the 23rd inst., with copy of trust deed and note of $20,000, signed by Oscar J. Ewy enclosed, there is one more question that I would like to ask to clear up matters, and that is, in case the title is vested in Oscar J. Ewy and a trust deed held by Mr. Gertner will it be necessary that the loan of $5,200 be paid off? This would of course be impossible for Mr. Gertner to do. I just want to get it clear so that there won't be any misunderstanding.

"I understand from Mr. Gertner that Oscar has quite a bunch of cattle and that he figured to get most of his debt cleared up by fall. I have a great deal of faith in Oscar and want to see that both him and Gertner get a square deal, but you will have to appreciate the fact that men like Gertner often times are somewhat hard to see matters as we do and they must be handled in the right way. Mr. Gertner speaks very highly of Oscar and are especially fond of Mrs. Ewy who will some day become very well to do through the Gertners. I am giving you this in confidence as I am familiar with the affairs and

Mr. Gertner never transacts any of his business unless he comes in to see me first. I remain,

                    Very truly yours,
                              A. F. Meyer, Cashier."

Fourteenth letter: April 30, 1923, from Wills, Cashier The Limon National Bank, to Meyer:

"Replying to your letter of April 26th, it is not our intention to force Oscar to pay the loan of $5,200, which we are carrying for him. We fully expect that his cattle will, in the next couple of years, take care of this deficiency as the cattle he now has show a good margin of profit. We are glad to handle this matter in any way that is satisfactory to you and Mr. Gertner, and if he prefers to hold the title to the land and allow us to credit the old $20,000 deed of trust down to $5,200 we could, of course, handle it in this way and save any further transfer on the land. But as we formerly wrote you, we presume he would prefer to have the $20,000 deed of trust credited to $14,500 as per our original understanding. We will handle the matter which ever way you suggest.

"We have always considered Oscar very square and sincere in all his dealings and the misunderstanding between him and us is the only difficulty in this deal as we see it, and I trust Mr. Gertner will be able to see it in the same light."

Fifteenth letter: May 4, 1923, from Meyer to Wills:

"Your favor of April 30th at hand. I talked to Mr. Gertner yesterday, and he thinks it will be best to reduce your trust deed to $5,200 and leave the land stand in his name for the present time. He figures that with the herd of cattle Mr. Ewy now has, he should be in position to practically clear up his entire indebtedness this coming fall.

"If you will reduce your trust deed to the above amount and advise me it will be greatly appreciated. I hope that this matter will be perfectly satisfactory to you in every way."

Sixteenth letter: May 7, 1923, from Wills to Meyer:

"We have your letter of May 4th, and, as per instructions, we have today credited note of Oscar Ewy's for $14,800, leaving a balance due on same of $5,200, which we will hold as security to our loan to Oscar of $5,200.

"We appreciate this very much and if, at any time, we can be of service to you, do not hesitate to call on us."

Meyer did not answer the above letter. It closed the correspondence between Wills upon behalf of plaintiff, and Meyer, for defendant Barbara Gertner's husband, Gottlieb Gertner, since deceased.

Seventeenth letter: After the above settlement, Mrs. Ewy wrote two letters to Wills, or the loan company. One is dated May 19, 1924, and reads:

"In regard to a government loan on our land we cannot get one until land probated which takes just one year in the State of Colo. We were just about promised to get a private loan from back east. The records at Cheyenne Wells were looked up and shows you never released the $20,000 mortgage, the party backed out, so see to this matter that we may get loan."

Eighteenth letter: January 31, 1925, from Mrs. Oscar Ewy to Wills, which reads:

"Mother can now get a loan on her land here to pay off $5,200 on it, if you wish so. What can you do about getting cattle for us this spring; that's the only way we can see our way out. Let us hear soon."

The testimony was that the above letter was written by Mrs. Ewy under the direction of the defendant Barbara Gertner.

Upon reviewing the evidence, the trial court determined that at first there was a misunderstanding between the parties, through the representations of the Ewys, but that on April 5, 1923 (the tenth letter above quoted), and in subsequent letters, the bank definitely and clearly made known to Mr. Gertner its position in the matter, and that Mr. Gertner, by his letter of May 4,

1923 (the fifteenth letter above quoted), written by Mr. Gertner's authorized agent, Mr. Meyer, elected to reduce the $20,000 Ewy note to $5,200; and that this became Mr. Gertner's completed contract with the bank. The court further determined that the evidence disclosed that this was the only contract upon which the minds of the parties definitely met. Thereupon formal findings, judgment and decree of foreclosure were made in favor of plaintiff, The Limon National Bank.

The following is a rough outline of the legal principles involved in the determination of this case, discussed in the following pages: (1) The requirements of pleading and proof imposed upon plaintiff; (2) those upon the part of defendant and Barbara Gertner; (3 and 4) rules followed in courts of review in examining the evidence; (5) application of the rules, review of the evidence, and analysis of history of the case; (6) importance of concluding or final letters in correspondence proving a contract negotiated between the parties; (7, 8 and 9) interpretation of meaning of letters and rules of construction employed; (10) further interpretation, and rights of holder of collateral security; (11) further construction of correspondence; (12) consideration; (13) fraud; (14) no fraud when alternative chosen was opposite from that suggested by the bank; (15) ratification; (16) why bank not required to return money; (17) status quo; (18) courts do not make contracts for parties; (19) nor relieve them from mere bad bargains; (20) defendant's claim tested by its harmful consequences; (21) attorney's fees.

1. The establishment of plaintiff's case requires a determination that the trust deed foreclosed, mentioned at the beginning of our statement of facts, was security for an unpaid past due balance in plaintiff's favor, in the principal sum of $5,200 besides accrued interest and attorney's fees. The trial court found from the pleadings and proof that such was the fact, or, as the court put it, this was the only agreement upon which the minds

of the parties definitely met. Such is also the view of a majority of this court, and we decide that the judgment should be affirmed, except that as there was no evidence offered as to attorney's fees, the allowance thereof cannot be sustained. This is more fully referred to hereafter in the 21st paragraph.

2. For defendant Barbara Gertner to prevail, the burden of proof is upon her to establish the truth and legal sufficiency of the allegations of her cross-complaint to the effect that the plaintiff bank, or the cattle loan company, agreed with her predecessor in interest, her deceased husband, Gottlieb Gertner, that he was to own the land free and clear of all liens and encumbrances, and that the bank or loan company should fully release and satisfy its $20,000 lien upon payment of the smaller sum furnished by Mr. Gertner, and thus cause the bank to discount its security on the Ewys' paper to the extent of over $5,000. The usual and well known general rule applies here, that the burden of proof lies upon him who substantially asserts the affirmative of an issue. 1 Greenleaf on Evidence, § 81. We agree with the trial court that defendant not only failed to establish her claim, but that it is amply shown by oral and documentary evidence, that the facts are the opposite from those for which she contends.

3. Among the rules adopted for the guidance of courts of review, we mention, (a) where the facts entitle a party to relief and the evidence is undisputed, and the judgment is based thereon, it will not be disturbed by the court of review; and (b) a judgment will not be reversed solely upon the ground of conflicting evidence. Much of the evidence is undisputed in plaintiff's favor; some of it is conflicting; tested by either or both of the above rules, we feel that we should not disturb the judgment.

4. Defendant in effect would have us voice another rule, as stated in *Thuringer v. Trafton,* 58 Colo. 250, 254, 144 Pac. 866, that the finding of a trial court is not neces-

sarily binding upon a court of review when it clearly appears from the whole record that such finding is wrong, or when a verdict or finding is so manifestly against the weight of the evidence as to result in a miscarriage of justice. We agree with this sound principle, but the converse is also true, that if the verdict or finding is not against the weight of the evidence, and if it would result in a miscarriage of justice to set aside a judgment, no occasion is presented for our interference. Our examination of this cause leads us to say that the decree in the instant case comes under the last named principle.

5. We have not declined to review the evidence. On the contrary, the pleadings, evidence, findings, judgment and decree of the court and assignment of errors have been subjected to the most rigid scrutiny. We have been compelled to have recourse to the transcript, due to a partially incomplete abstract. Defendant did not file a reply brief.

For easier analysis, the history of the case may be divided generally into four periods: (a) From the creation of the debt in 1920, to about October 10, 1922, when the Ewys started back to Minnesota to see Mr. Gertner; (b) from the first letter written, which was October 20, 1922 (q. v.), to and including the ninth letter, dated March 29, 1923; (c) from the tenth letter, dated April 5, 1923, to the sixteenth letter, dated May 7, 1923, which closed the transaction, and (d) from May 29, 1924, the date of the seventeenth letter, to January 31, 1925, the eighteenth letter, the last one written by Mrs. Ewy upon her mother's behalf, where she said: ''Mother can now get a loan on her land here to pay off $5,200 on it, if you wish. * * *'' The testimony of A. F. Meyer, Gertner's agent, pertains to the letter writing epoch of the parties.

As to the first period (a), defendant relies upon the testimony of Mr. and Mrs. Ewy, as to the alleged promise of the bank before the Ewys went east, but this is

denied by the testimony of the bank, and the trial court believed the bank's witnesses, and not defendant's, and determined that there was no completed contract until May 4, 1923, which contract was entirely different from that stated by the Ewys. This disposes of the first period of time in plaintiff's favor under the conflicting evidence rule. The correspondence during the second period (b), merely emphasizes the fact that the court was right in saying that at first there was a misunderstanding between the parties. The letters passing between the bank and Gertner's representative, A. F. Meyer, during the third period (c), show the agreement to be exactly as plaintiff claims it, especially the fifteenth, from Meyer to Wills, and the sixteenth, from Wills to Meyer, which closed the correspondence between them. As to the fourth period (d), the final letter written by Mrs. Ewy, it shows that she and her foster mother, the defendant Mrs. Gertner, fully recognized and admitted, twenty-one months after the deal was closed, that there was an encumbrance of $5,200 on the land. So much for the weight of the evidence. The complaint in foreclosure was filed on November 27, 1925.

6. It is worthy of special comment that all but two of the first sixteen letters quoted, passed between the bank or loan company on the one hand, and Meyer for Mr. Gertner on the other. Their very purpose was to arrive at an agreement. The last two, Nos. 15 and 16, were the least stressed by counsel for defendant, both in their brief and at the oral argument, but they are the most important of all. We cannot tell what a contract means by emphasizing disputed points that the parties themselves are trying to settle by correspondence, and by avoiding their last letters that put their differences at rest. We should have to read their letters backwards to do this, and would get nowhere by doing it.

7. Concerning the interpretation of the letters, it has been suggested that the words "semblance of security" and "sign of security" in the tenth letter quoted—that

of April 5, 1923, from the loan company to Meyer—indicate that the bank intended to create the impression that the $5,200 encumbrance on the land was to be a mere fiction. We do not so regard it. To ascertain one's meaning, we do not take disjointed words, sentences nor parts of sentences out of a letter. The evils of such a course are well illustrated here. We must read the context. We quote in part from the tenth letter referred to: "* * * We (the loan company) of course are perfectly willing to turn you a first deed of trust on this land in the sum of $14,500 as of December 1, 1922, *but we want the title to this land to rest in Oscar* (Ewy) *and his wife, as we are still carrying some plain notes for Oscar and it is necessary that we have some semblance of security*, and believe that when you fully understand the situation you will have no trouble in settling the matter, *and with this in view we are enclosing herewith warranty deed from Mr. Gertner to Oscar J. and Marie Ewy* covering Sections 1 and 11, and we are asking you to mail this deed back to Oscar (Ewy) and upon receipt of same, we will turn over to you the deed of trust for the full amount of your indebtedness which will recite interest from December 1, 1922, at eight per cent. * * *"

8. It was the plainly expressed purpose of the writer of the above letter (No. 10) that if Mr. Gertner took a first trust deed, then the title to the land should rest in Ewy and his wife, for the reasons stated more than once in the letter. In the same connection, the words, "semblance of security" necessarily refer to the antecedent words in the same sentence, Ewy's plain notes, and not to the secured note in controversy. It is more fully explained further on in the same letter, in speaking of "sign" of security, that with Oscar (Ewy) owning the land, he could make a better showing than as a renter and still Gertner would be fully protected. Wills' testimony for the bank, without disparaging or contradicting the letter, made it even plainer that it would have

thus enabled the bank to take a second trust deed for the balance due from the Ewys. We quote freely from the whole evidence, because no error is assigned to any part of it, and the testimony referred to is pertinent to the claim asserted by defendant. Defendant's supposed point loses all importance, however, in view of the fact that Gertner rejected the above proposition; and for his and the Ewys' own reasons, did not deed the land back to the Ewys, but decided to keep it in the family, and chose the second alternative which was the final agreement. See letters Nos. 12, et seq., supra.

9. In an effort to show that the bank did not intend to enforce its security, or that it tried to so mislead Gertner, our attention is further directed to statements contained in the thirteenth and fourteenth letters above quoted, but we believe that these illustrations demonstrate the fallacy of the proposition that defendant intends to prove by them. In the thirteenth letter, dated April 26, 1923, Meyer, for Gertner, asks Wills of The Limon National Bank. "* * * *in case the title is vested in Oscar J. Ewy and a trust deed held by Mr. Gertner* will it be necessary that the loan of $5,200 be paid off? This would of course be impossible for Mr. Gertner to do. I just want to get it clear so there won't be any misunderstanding."

To make defendant's reasoning good, it requires the exercise of considerable unjustifiable legerdemain, in the substitution of the name of Gertner for that of Ewy. That is to say, the premise supposed in Meyer's question was, in case *Ewy*, (*not Gertner*) owned the land. Certainly, if *Ewy* owned the land and *Gertner* held the first lien or deed of trust on it, Gertner would not have had to pay it because under the conditions supposed, Gertner himself would have been a creditor of the Ewys to the extent of $14,500, with a first lien on the land to secure its payment. Again, however, we must remark, Gertner rejected this offer, and having been fully informed, elected to buy the property subject to the $5,200

encumbrance in favor of the bank. By the same sign, since *Gertner* owned the land, and *the bank* held the first trust deed, which is what finally happened, then Gertner or his heirs must pay or lose the land. There does not appear to be anything so complicated in either one of these contingencies as to distinguish it from the most ordinary, every day, honest real estate transaction, and the bank was frank and outspoken in making it clear to its Minnesota correspondent. It is to be noted that Gertner or Meyer asked no question as to what would happen in case of default if *Gertner* owned the land and *the bank* took the first deed of trust. They did not have to ask, because the trust deed or mortgage gave its own warning. And if we take defendant's position literally—that Gottlieb Gertner would never be called upon to pay in any event,—it is observable that even now no money judgment has either been sought or awarded against him, or against his estate or heirs, whether the bank had such right or not. This is a suit in rem, to foreclose the first lien of the bank against the land.

10. Passing to the fourteenth letter, that of April 30, 1923, from Wills, representing the bank, to Meyer, acting for Mr. Gertner: In the first paragraph, Wills said: "Replying to your letter of April 26th, it is not our intention to force Oscar (Ewy) to pay the loan of $5,200, which we are carrying for him. We fully expect that his cattle will, in the next couple of years, take care of this deficiency as the cattle he now has show a good margin of profit. * * * "

It is argued from the above that the bank intended to cancel its $5,200 lien on the land, but we cannot so hold, because the letter did not so state. At best, it was only a hope or expectation, and not a promise, that enough would be realized from the sale of the cattle to satisfy the debt. It was also a statement of the bank's intention not to force or crowd the Ewys, but to give them at least two years additional time, which time

and more was given. We cannot give the bank's words so unreasonable a construction as to suppose, when it said it did not intend to force the Ewys, and also mentioned the time, "a couple of years," that it meant thereby that they would never have to pay. In fact this is not defendant's serious contention. She asserts that the bank promised to look solely to the cattle for its security, but there is no proof of such a promise. All that we can make out from the above is, that when a bank has two securities for the same debt, and one security fails, there is one left.

As we said at the outset of our statement of facts, the security enforced in this action was collateral to the larger indebtedness of the Ewys to the bank, which remained unpaid. The holder of a note or security has a right to sue upon it, even if held as collateral to another. *Rogers v. First State Bank,* 79 Colo. 84, 92, 243 Pac. 637; 16 Ency. Pl. & Pr. pp. 639, 640. This is what collateral is for.

11. The Ewys were in the cattle business on a large scale, and Gertner, familiar with their affairs, was even more optimistic than Wills, as is evident from Meyer's reply to Wills (the 15th letter), wherein Meyer says that Gertner figured that with the herd of cattle that Ewy then had, that he (Ewy) "* * * should be in a position to practically clear up his entire indebtedness this coming fall (1923). * * *" The Ewys needed time, and the bank gave it to them. This suit was brought about two years and seven months after the above letter was written. That the cattle did not bring a big enough price, or that the Ewys became discouraged and took bankruptcy, was not the fault of the bank. The latter, to guard against loss, was continuously insistent in preserving its lien. Attention is called to places in the correspondence where the bank did promise to release its lien on the land, but this must be taken in the light of the testimony that the bank did not at first know that the Ewys had conveyed the property to their foster

father Gertner, and further that the release to which defendants were entitled was only to the extent of the payment made *if Gertner kept the land*. This was the bank's understanding as the evidence showed. That a partial release was due may be conceded, but it is allowed here, at the instance of plaintiff, and defendant has not been hurt by the failure to execute it, and plaintiff must not be mulcted into a full release upon only a partial payment by Gertner.

In permitting defendant so wide a range of conjecture, we must now return and point again to the final settlement of the parties, shown in the 15th and 16th letters, the contract which the trial court recognized, and which we approve. No doubt defendant can pick out other disconnected excerpts from the previous letters that taken alone may afford them comfort, but so can plaintiff. We must take the correspondence in its entirety and have done so.

12. Consideration.—There is such an overwhelming array of ancient legal and equitable precedents of this and other courts that discountenance defendant's claim, that we cannot take time to mention them all. We shall refer to only a few of them, and we shall speak now of consideration. Defendant's counsel claims that there was none, but we must disagree with them. A valid consideration may consist of a benefit to the promisor, or a detriment or disadvantage to the promisee. *Dyer v. McPhee*, 6 Colo. 174. The benefit of Gottlieb Gertner included the grant of title to the 1280 acres to him from the Ewys, subject to the bank's indebtedness; also the reduction of the bank's lien from $20,000 to $5,200; also the two years and seven months' extension of time that the bank gave on the balance due, to say nothing of the good consideration of love and affection between the Gertner and Ewy families. The benefit of the reduction of the lien and the extension of time, passed from the bank to Gertner; the rest was between the Ewys and Gertner. The consideration was abundant and valid.

If further technical discussion is desired, sec. 13 C. J. p. 365, § 237, and 6 R. C. L. p. 678, § 85. If we consider it as a modified contract, no new consideration was required, there being consideration for the original. 13 C. J. 593. The promise for the promise is a valid consideration for the modification. *McKay v. Fleming,* 24 Colo. App. 380, 384, 134 Pac. 159. It is scarcely too much to say that any further benefit to Gertner might well be termed a gratuity. The law that requires a consideration to support a contract—that one should not be forced to give something for nothing—is based upon sound reason and justice. But looking at it from the standpoint of the bank, we must remark that if defendant is possessed of any compunctions in seeking to enforce an involuntary contribution from the bank to the extent of many thousands of dollars, it is not discernible in the record.

13. Fraud.—Counsel for Mrs. Gertner in their brief characterize the acts of the bank as fraudulent, but it was neither pleaded nor proven; both are essential. Charges of such serious nature must be pleaded and sustained by clear and convincing proof. *Dyer v. Bengston,* 71 Colo. 55, 203 Pac. 1101; *Denver & R. G. R. R. Co. v. Sullivan,* 21 Colo. 302, 41 Pac. 501; *Denver & R. G. R. R. Co. v. Ptolemy,* 69 Colo. 69, 169 Pac. 541; 27 C. J. p. 40, § 165; *Jessey v. Butterfield,* 61 Colo. 256, 260, 157 Pac. 1, and many other cases.

14. No fraud was committed by the bank on Gottlieb Gertner, when the latter chose an alternative opposite from that recommended or suggested by the bank. See the twelfth and fourteenth letters above, where the bank suggested that it believed it would suit Gertner better to take a first trust deed, and the fifteenth letter, where Meyer for Gertner impliedly declined it, and expressly chose the alternative now sued upon.

15. Upon the subject of ratification and condonement of fraud, with full knowledge of its commission, which under the facts of this case would bar Gertner and his

heirs, if the bank's action *had* been fraudulent, see *Ponder v. Altura Farms Co.,* 57 Colo. 519, 143 Pac. 570; *Widman v. Barry,* 63 Colo. 427, 168 Pac. 31; *Lewis v. Carsh,* 79 Colo. 51, 244 Pac. 598; *Emley v. Tenenbone,* 81 Colo. 399, 255 Pac. 627, and other cases.

16. Counsel for defendant put another query in seeking to impugn the good faith of the bank, and ask why the bank did not send the money back to Gertner or Meyer in Minnesota when it became apparent that there was a misunderstanding. The obvious reason was that Gertner did not want it back; hence, did not ask for it. Defendant does not want it back now, or at least does not say so. Gottlieb Gertner wanted it credited to the Ewys, the purpose for which they went east, and for which he borrowed it. It was so credited. It would have defeated Gertner's own family purposes if it had been returned. In the fourteen letters interchanged between Wills and Meyer, there is no hint of the money being returned. The only misunderstanding was as to the adjustment of the security, a misunderstanding induced by the Ewys, and the parties settled that themselves. Plaintiff cannot be charged with fraud or bad faith for not doing something that defendant and her predecessor in title did not want and have never asked for.

17. The status quo.—Assuming for the purposes of defendant's argument that there was fraud, it is too late for Gottlieb Gertner's heir to complain. By accepting the bank's offer four years ago, Gertner put it out of the bank's power to realize or get other security from the Ewys, who have gone into bankruptcy. It is impossible to restore the status quo. "It is elementary that a decree cancelling a contract for fraud or misrepresentation will not be entered unless the parties can be placed substantially in statu quo; and the complaint in such a case must ordinarily allege a return, or an offer to return whatever the plaintiff received under the contract." *Jessey v. Butterfield, supra,* at page 260. Neither Gertner nor his heir have offered to accept the

other alternative, nor restore the bank's previous status, and could not do it now if it were tried. Gertner kept the benefits—another good reason for denying relief.

18. Courts do not make contracts for parties. It is not for us to say whether Gertner made a wise choice. One possibly might think, in the light of subsequent developments, that it would have been better for him to have taken a first trust deed to secure a loan of $14,500 rather than to have bought the land with a $5,200 encumbrance on it. One of these was all that he was entitled to. Both were bona fide offers; both were fully explained to Gertner; he announced his own determination, in fact, the opposite from the suggestion of the bank, as we said in the fourteenth paragraph above. Gertner, or his heirs after his death, cannot renege now. If anything, defendant is in a worse position, having gone a step farther. She now seeks to reject both offers, repudiate the acceptance of the one, and to defend here upon the theory of another alleged contract wholly inconsistent with both alternatives, the one now selected being an alleged arrangement that the trial court held (with which we agree) never was made by the parties, and is injurious to plaintiff's rights. These confusing and changing desires cannot well be gratified. Plaintiff's complaint states the actual agreement. The eighteenth letter, supra, written by Mrs. Ewy under Mrs. Gertner's direction, admits it. Under these circumstances, we must apply the well known rule that it is the duty of the court to interpret the contract made by the parties themselves, and not to make a new one for them. *Sunset Oil Co. v. Whistleman,* 77 Colo. 570, 237 Pac. 1116; *Seitzinger v. Modern Woodmen,* 106 Ill. App. 449, 457, affirmed in 204 Ill. 58, 68 N. E. 478.

19. Stating it in another way, we cannot say that Gertner made a bad bargain, but even if he did, courts do not open their doors to those that are suffering merely from their own bad bargains, not induced by any misrepresentations. *Fraser v. Walker,* 65 Colo. 126, 173 Pac. 1088; 13 C. J. p. 366, § 237.

20. Test of defendant's claim by its consequences.—
We might go on indefinitely with citations of authorities showing why the law or equities of the case are not with defendant, but shall mention only one more—a test of her position by its harmful consequences, if permitted. Meyer's undisputed testimony is that the warranty deed from the Ewys to Gottlieb Gertner was intended only as security for a loan of $14,500 to them. Such being the case, as between the Ewys and Mrs. Gertner, the Ewys may still pay it off, but even at that it is junior to plaintiff's prior recorded lien of which the Gertners had full knowledge. The Ewys have gone through bankruptcy; they have not left the land; they live on it with the defendant Mrs. Gertner. This is all a matter of record in this case. So, if we hold for defendant, we must say that a warranty deed, which is in fact, but not in form, intended as a mortgage, may be used as a storm-cellar pending the bankruptcy, from which secret shelter the parties may emerge unscathed after the financial clouds have cleared away, with the bank's money or security in their pockets, and a certificate of discharge in bankruptcy by way of a clean bill of health. Such is not the law. Gottlieb Gertner and his widow Barbara Gertner would of necessity be parties to the transaction, if it were allowed. Viewed in this light, we desire to do defendant the honor of believing that she herself can scarcely wish such a situation to obtain.

21. Attorney's fees.—The note and subsequent renewals thereof call for attorney's fees. The sum of six hundred forty-four dollars and thirty-four cents was allowed as such, although no proof concerning the same was offered. Counsel for plaintiff admit that this was an oversight and that the ruling in *Jones v. First National Bank,* 74 Colo. 140, 219 Pac. 780, as to the necessity for such proof, is applicable.

The judgment will be modified by disallowing the attorney's fees, and reduced to that extent only. In all

other respects it is affirmed. Plaintiff did not offer to abide by the judgment except as to attorney's fees or at all; this feature was only incidental and the costs will be taxed to plaintiff in error.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE DENISON and MR. JUSTICE BUTLER dissent.

MR. JUSTICE BUTLER, dissenting.

The material part of the transaction between Gertner and The Limon National Bank is in writing; hence this court has opportunity equal to that of the trial court to determine the nature of the transaction. The Limon bank was pressing Ewy for payment. Through the efforts of Mrs. Ewy, an arrangement was made whereby Ewy deeded to Gertner the Cheyenne county land, and Gertner borrowed money on some Minnesota land, and, through the First National Bank of Westbrook, Minnesota, sent to the Limon bank a draft for $14,411.70, payable to the order of Ewy. The draft was accompanied by the letter that is referred to in the majority opinion as the "fourth letter." As stated in that letter, the draft was sent with the understanding that the mortgages covering the land in question "be satisfied and the satisfaction placed of record." The letter requested the Limon bank to "see to this," and to send to the Westbrook bank "the old mortgages, notes and abstract covering Mr. Ewy's land in Cheyenne county." This was a clear, definite offer to pay the amount enclosed, provided that, if accepted, it must be in satisfaction and discharge of the mortgages upon the land. The Limon bank, when it received the draft, had the option to accept the offer, or to reject it. It accepted the offer by the letter referred to as the "fifth letter," and by endorsing the draft in Ewy's name, collecting it, and applying the proceeds on Ewy's indebtedness. Wills, the Limon bank officer who wrote this letter, testified that the party who wrote the fourth letter seemed to think that the mortgage

was for $14,350; that that is what he (Wills) thought the person who wrote the fourth letter believed; but that he (Wills) did not write him and tell him that he was mistaken. He swore, however, in attempted explanation, that he "did not know at that time that the land was to be acquired by Gertner; had no reason to believe that." And yet on the very day that he wrote the letter acknowledging the receipt of the draft and promising that "the release and abstract will be forthcoming," he wrote to Ewy the "sixth letter," in which he said: "We are today sending for your papers and will have them released as per their request and forward them to them, or to you, whichever you desire. I believe you were to make a deed to them. We will prepare this deed for you if you have not already made one and send it to you for your signatures. Let us know about this."

When Gertner's offer and draft were accepted, the mortgage debt, so far as the land was concerned, was paid, and Gertner was entitled to have the mortgage released, and by suit could have compelled such release. The letter enclosing the draft ("fourth letter") requested the Limon bank to see to it that the "satisfaction" be placed of record. After awaiting several months, the Westbrook bank (acting for Gertner) received word that no release had been recorded, and that the amount of the incumbrance was $20,000. Ewy's attention was called to the situation by letter dated March 28, 1923 ("ninth letter"). On April 5, the Cattle Loan Company wrote to the Westbrook bank ("tenth letter") offering to "turn" a first trust deed for $14,500, stating that it wanted title to the land to rest in Ewy and his wife; that it still was carrying some plain notes of Ewy; and that it is "necessary that we have some *semblance* of security, * * * some *sign* of security." On April 30, the Limon bank wrote to the Westbrook bank ("fourteenth letter") that it was not its intention to force Ewy to pay the loan of $5,200, as it fully expected that his cattle "in the next couple of years" will

take care of this deficiency, as "the cattle he now has show a good margin of profit." It also said, "We presume he [Gertner] would prefer to have the $20,000 deed of trust credited to [with] $14,500." On April 30, after receiving the assurance in the letter of April 5 ("tenth letter") that it was necessary for the Cattle Loan Company to have "some semblance of security," the Westbrook bank wrote to the Limon bank on May 4 ("fifteenth letter") that Gertner "thinks it will be best to reduce your trust deed to $5,200 and leave the land stand in his name for the present time." On receipt of this letter by the Limon bank, the Cattle Loan Company, on May 7, wrote to the Westbrook bank ("sixteenth letter") that it had credited $14,500 on Ewy's note, leaving a balance of $5,200, "which we will hold as security to our loan to Oscar of $5,200." The trap was sprung. The security no longer was to be a "semblance," a seeming security, a mere pretense, but was to be converted into a real, an actual, an enforceable security. Gertner's acquiescence was in the continuance of a mere "semblance" of security. But if it were otherwise; if, laboring under the mistaken belief that, as the Limon bank and the Cattle Loan Company had used his money and also continued to hold the unreleased mortgage on the land, they were in a position to dictate terms to him—terms that he was helpless to refuse—he chose what he considered the lesser of two evils, and acquiesced in the endorsement of a credit of $14,500 on the mortgage debt, intending that the mortgage should continue as a valid security for $5,200—even on that supposition, the Limon bank would have no lawful right to foreclose the mortgage. There was no consideration for the revival of any part of the debt, which, so far as the land is concerned, had been fully paid and discharged.

Another matter is worthy of notice. The letter of November 28, 1922 ("sixth letter"), conclusively shows that on that date Wills believed that Ewy was to deed the land to Gertner. Where did he get this belief or

knowledge? The testimony of Ewy and his wife furnishes the answer. It is this, in substance: Wills called at the ranch in October, 1922, and proposed that the Ewys go to Minnesota to get Gertner to buy the land for $14,500. He said that if they could sell the land for that amount he would give clear title. Wills did not make two propositions; simply proposed that they try to sell the land to Gertner. No mention was made of anything except $14,500 to clear the land. To enable them to go, Wills permitted them to use $200 received from the sale of cattle. Wills said, "Why don't you go back and try to get the old man to buy this?"—referring to the land. Wills told Ewy to sell the land for $14,500 and give Gertner a deed for it, and the bank would release the land and carry the balance against the Ewy cattle. If this conversation did not occur—and Wills swears that it did not—where did Wills get the belief or knowledge that Ewy was to deed the land to Gertner? No answer to this question can be found in the record.

As to the letter of January 31, 1925 (?), in which Mrs. Ewy said, "Mother can now get a loan on her land here to pay off $5,200 on it, if you wish so" ("eighteenth letter"), this is to be said: Mrs. Ewy testified that Mrs. Gertner "knew it was not a lien several months after the deed was given;" that "they never thought it was a lien upon the land." By reason of the extraordinary conduct of the Limon bank, Mrs. Gertner found herself in this predicament: A mortgage that had been satisfied and discharged by her husband, and which the bank had promised to release, was held unreleased by the Limon bank, and was liable to be foreclosed. Evidently laboring under a mistake as to her legal rights, she was attempting to avoid the impending calamity. Viewed as an admission, it is without force; viewed as a promise, it is indefinite and is without any consideration, and therefore it is wholly ineffectual to revive a lien that had been satisfied and discharged.

Entertaining these views, it is impossible for me to concur in the majority opinion. The judgment should be reversed.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE DENISON authorize me to say that they concur herein.