# No. 12,063.

## BUCHHALTER *v.* MYERS, ET AL.

Decided April 1, 1929.   Rehearing denied April 22, 1929.

Messrs. BLOUNT, SILVERSTEIN & ROSNER, Messrs. DAVIS & WALLBANK, Mr. HENRY E. LUTZ, for plaintiff in error.

Mr. ERNEST MORRIS, Mr. C. E. WAMPLER, Mr. CHARLES GINSBERG, Mr. R. H. WALKER, for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the .opinion of the court.

THIS suit was commenced in the district court on May 21, 1926. Final judgment was entered on December 12, 1927, and it was argued before this court at the present term. It was brought by Charles B. Myers against Joseph Buchhalter, and Colorado Pulp and Paper Company, a corporation, hereinafter called the company or the pulp company. There were also a large number of other defendants, including all of the directors of the company. The final judgment and decree was entered against Buchhalter in favor of *the pulp company.* The only judgment in favor of the plaintiff Myers was for costs; he sought no other judgment in his own favor. Buchhalter brings error. The only parties to the writ of error are Buchhalter, Myers and the pulp company, but George W. Beck, receiver of the pulp company, has voluntarily appeared by his attorneys and adopted the Myers brief. When not otherwise designated, we shall refer to Myers as plaintiff and Buchhalter as defendant.

The pulp company is a Colorado corporation with an authorized capital stock of $600,000, with shares of the

par value of one dollar each, 250,000 of which are preferred, and 350,000 common stock. The company was organized June 2, 1925. There are seven directors. Myers and Buchhalter are directors. They are also holders of all outstanding capital stock, except five shares issued to qualify the other directors. The total stock is about evenly divided, but Myers claims to own a majority over Buchhalter and the other directors. At the time this suit was started, the company was engaged in a paper business, and the manufacture of paper products, in Adams county. An understanding of this opinion requires the recital of certain matters that led up to the formation of the pulp company, little of which history has any bearing on the complaint, but, paradoxically, most of which forms the basis of the final judgment and decree.

In the year 1923, or thereabouts, Myers organized the Myers Pulp and Paper Company, hereinafter called the Myers paper company, or Myers company, to carry on a paper business similar to that of the defendant pulp company. The Myers company is not a party to this suit. It had a short life; the business was a failure; it became hopelessly involved, and culminated in a receivership in the district court of the City and County of Denver. Its property was ordered to be sold at a receiver's sale on May 27, 1925. Myers wanted a reorganization, but lacked capital, and he and Buchhalter evolved a plan of purchase. This plan was reduced to contract in writing between Myers and Buchhalter. The first is dated March 31, 1925, Exhibit A, the original contract. The second is dated June 1, 1925, Exhibit 1, a supplementary contract modifying Exhibit A. They are both in the form of letters from Myers to Buchhalter, with the latter's approval and acceptance endorsed thereon. Together they form the written agreement of the parties. Exhibit 1 changed the terms of purchase of the Myers assets and also of the manner of division of mutual profits. When Exhibit A was made, it was estimated that it

might take $300,000 more or less to acquire the Myers Paper Company property and assets, but it developed later that it would take about $70,000 more. Because of this, the supplementary agreement, Exhibit 1, was made. Both contracts were made before the formation of the pulp company. Myers and his mother held claims against the Myers Paper Company and Buchhalter purchased other claims.

In the other cause where the Myers Paper Company matter was pending, the decree provided that creditors would be allowed to use their claims on their bids for the Myers company property. Buchhalter bought claims at a discount against the Myers company. He also interested capital to furnish cash for the purchase of the Myers Paper Company assets. Myers and Buchhalter combined their claims, and these, together with the cash capital provided by Buchhalter, constituted the purchase price paid the Myers company receiver for such assets. Myers asserts that Buchhalter should account to the pulp company for his profits on the purchase of the Myers Paper Company claims. Buchhalter denies the assertion, and refused to do it, but the court allowed it. All of the assets of the Myers Paper Company were acquired by the pulp company, and corporate stocks and bonds of the latter company were distributed between the two men as provided in Exhibit A, and as modified by Exhibit 1. The purchase of the Myers Paper Company mill and other assets at the price agreed upon was unanimously ratified in the usual form, at a pulp company organization meeting held on June 2, 1925, in which Buchhalter and Myers participated. The delivery of pulp company stock and $250,000 bonds was the consideration approved by the directors.

Exhibit 1 provides, among other things, that "All of said bonds shall be delivered and paid to you [Buchhalter]." This was done. In addition to profits on old Myers Paper Company claims, Myers asserts that Buchhalter should account for the value of a portion of the

$250,000 bond issue. Buchhalter denies this, and refused to do it, but the court allowed it. Myers does not claim that there should be an accounting to him personally, nor to the old Myers Paper Company or its representatives, but sought and obtained it in favor of the pulp company. The Myers Paper Company is mentioned only incidentally, to explain the basis of the judgment and decree in the present cause. The court held Exhibit 1 void for lack of consideration, and further held that this made Exhibit A the contract of the two parties, Myers and Buchhalter, and that a trust resulted in favor of the pulp company.

In Myers' complaint he asked for a cancellation of a certain voting trust agreement, dated June 2, 1925, between the stockholders of the pulp company, whereby certain voting trustees, consisting of Buchhalter, Myers and Harry C. Davis, were empowered to vote such stock at corporate meeting, in place of the legal holders of the stock. It was signed by all of them, and by The International Trust Company as trust officer. Plaintiff complained that the voting trust agreement was obtained by Buchhalter's "overreaching" him; also by promises not kept nor intended to be kept; and that it is void as against public policy. Plaintiff also complained of various acts of fraud, mismanagement, extravagance and waste, contrary to his interest as a stockholder, committed by Buchhalter and one Morris H. Block, for about eight months before the suit was brought. This period of time was about four months after the formation of the pulp company on June 2, 1925. Block was the pulp company manager. A conspiracy between Buchhalter and Block to wreck the pulp company is charged. Without further detail, and to quote from the statement of Myers' counsel in their brief as to the purposes of the suit, they were: "(1) For the appointment of a receiver; (2) to restrain further mismanagement and squandering the assets of the company; (3) to cancel the voting trust agreement; (4) to require the defendants 'to account

for all moneys, profits and property fraudulently or unlawfully received by them or any of them.' " Also for general relief.

Motions and demurrers were overruled; the defendants answered, and admitted the execution of the voting trust agreement and certain formal allegations, but denied all of the wrongful acts charged, and alleged among other things in effect that the pulp company's financial troubles were attributable to Myers by his interference and impairment of its credit by his suit for a receiver. The court appointed George W. Beck receiver on May 16, 1927, who is now in charge of the property. A referee was also appointed to take testimony under an accounting ordered by the court. The case was tried to the court, which resulted in a judgment and decree as follows: First. Cancellation of written contract, Exhibit 1, between the plaintiff Myers and defendant Buchhalter. Second. Cancellation of the voting trust agreement. Third. Cancellation of 2,500 shares of preferred stock issued to Buchhalter, decree made conditional that upon his surrender of the stock, $2,500 would be credited on the money judgment. Fourth. Judgment in favor of the pulp company, against Buchhalter, for $17,512.22, together with all costs of the receiver, including the expenses of the reference upon the accounting. Fifth. That plaintiff Myers have and recover from Buchhalter, all his costs, including any costs of the reference. Sixth. Retention of jurisdiction in the district court for the purpose of carrying out the order of May 16, 1927, wherein Beck was appointed receiver, and defendant Buchhalter was declared guilty of a breach of trust as trustee.

1. We might have set out the terms of Exhibits A and 1 in full if we had regarded a construction of their terms as germane to the issues; but we do not so look upon it. Neither of the agreements was pleaded, a breach thereof was not alleged, cancellation of Exhibit 1 was not sought, nor any grounds pleaded why it should be canceled.

Defendants preserved their rights by timely objections, and it was error to overrule such objections.

2. At or near the close of the trial, evidently about 18 days after it had commenced, plaintiff was permitted to file an amendment to his complaint "to correspond to the proof." In this he alleged an oral promise by Buchhalter to Myers, previous to the written contract, contrary to its terms. This was error, both from the standpoint of pleading and as varying the terms of a written instrument. In the same amendment, he alleged a breach of trust on Buchhalter's part, and failure to account for certain bonds of the $250,000 issue, which plaintiff claimed that Buchhalter had agreed to do. Plaintiff's amendment pertained to the contract between himself and Buchhalter, before the company organization. It was not legitimately connected with the complaint. It stated an entirely new cause of action and constituted a departure from the issues as made. Except as to the voting trust, as we said above, the allegations of the complaint pertained to wholly different acts, alleged to have been committed about four months after the formation of the company. We are not meticulous about dates if they are unessential, but the pleading will be construed most strongly against the pleader. Plaintiff's deliberate selection of dates, the elaboration of alleged happenings within that period, and his expressive silence as to other causes of action, if any, outside of such period, must essentially exclude him from there trying out a new cause of action. Amendments "to conform to the proof" are not allowed when not germane to the case as made. If they were, almost anything might be proven under any kind of a complaint, and cured by amendment at a time to suit the pleader's will. This amendment was made about 11 months after the case was filed. It appears to us to have been an afterthought.

3. Notwithstanding the fact that the complaint, except as to the voting trust, pertains to post-corporation affairs, the main part of the judgment and decree is based

on pre-corporation matters, and not even according to Myers' and Buchhalter's written contract, as evidenced by Exhibits A and 1. It has resulted in this situation: The money judgment is for $17,512.22. Of this amount, $607.71 pertains to post-corporation affairs, and $16,894.51 to pre-corporation matters. There may be a slight variation on account of interest computations, but the net result is that about 96.5 per cent of the money judgment is based on matters which to say the least, were not pleaded. It is rendered worse by the fact that it is inconsistent with the corporate action of the board of directors at its first meeting on June 2, 1925, in which Myers participated, wherein a pre-corporation arrangement, contrary to the decree, was ratified by the directors. 96.5 per cent of the money judgment is therefore wrong. We shall speak of the other 3.5 per cent in another place. In the face of these figures, Myers' counsel have undertaken the herculean task of procuring an affirmance of the judgment.

4. We are not beguiled by the fact that the judgment is in favor of the pulp company, instead of Myers. It does not cure the failure to plead under the Code. And the fact remains that whether we look upon Buchhalter and Myers as promoters or stockholders, they are the owners of all of the outstanding stock of the pulp company except five qualifying shares for other directors. Regardless of names or titles, the controversy is between them. Myers' counsel point out that this is an equitable proceeding, and speak alluringly of the broad powers of courts of equity. Quite so, but it would not be equity, any more than law, if a suitor were allowed to plead one thing, and to prove, over objection, something different, or matters foreign to his bill of complaint. A chart and compass are as essential for guidance in equity as they are in law. Equity does not spell chaos. The position of Myers' counsel might be well taken if the ancient reproach were true, that to "get one's head in chancery" meant interminable punishment from invisible

arrows. The practice is obsolete now, if it ever did prevail; at least we wish to help make it so.

5. The conversation of him who invokes equity, as in law, must mean yes or no, "for whatsoever is more than this cometh of evil." We cannot but feel that it might prove almost as bad, if not fully so, for a defendant to be required to go into court and be forced to trial on a complaint misleading as to the nature of the charge, as it would be if he were misdirected by the summons and sent to a wrong venue, while the proceedings were being held at another place. It would result in permission to fire from ambush in any event, no matter how amiable the purpose of the hunter might be. It accomplished the same result in this case. The court will not visé false passports, nor approve of a bogus ticket. Fraud must be specifically pleaded and proven. *Gertner v. Limon National Bank,* 82 Colo. 13, 39, 257 Pac. 247; *Koerner v. Wilson,* 85 Colo. 140, 274 Pac. 737, and cases there cited.

It is no answer to say that the facts, real or imaginary, on which plaintiff recovered, are not dependent on proof of fraud. Even if based on contract, express or implied, the only place where written pleadings are dispensed with under our system, is in an ordinary action in a court not of record, the jurisdictional limits of which are not unfamiliar to the public. If this sounds didactical or too elementary for judicial pronouncement, our answer is that a heavy judgment and decree of the trial court, now under review, rest on the sandy foundation of a violation of these fundamentals.

6. It was error to impose a trust on Buchhalter as promoter, for it was not within the issues. We use the word "promoter" here in a descriptive sense, as defined in 7 R. C. L. page 70, § 50: "Promoters are the persons who bring about the incorporation and organization of a corporation." It is safe to say that almost any one, whether a promoter or not, may undertake a trust, and be legally accountable therefor, but this general statement does not

control specific facts. The determination as to whether or not there is a trust, the nature of the trust, the identity of the trustee and cestuis que trustent, whether future stockholders or otherwise, and as to whether the trust has been performed or breached, are all questions too important to be decided without written pleadings and proof under such pleadings. The "trustee" theory does not disabuse the mind of the fact that in the parties' ante-corporation contract, Myers represented Myers, Buchhalter represented Buchhalter, and there were not and are not any other parties involved. Myers, as to such pre-corporation events, cannot realize on account of any supposed duality of person between himself as a pre-corporation promoter and a post-corporation stockholder, nor because of any superior virtue, if any, of the one over the other. We say the same as to Buchhalter. They were both active participants in all of the pre-corporation matters of which Myers now complains. If it was a "secret," as his counsel now say, he was in it. Myers' own signature, other documentary evidence and oral testimony, prove this in spite of his denial. We are cited to a vast number of authorities by respective counsel on the law of promoters, but even if the questions can be determined in other jurisdictions without written pleadings, the rule is otherwise with us. Citations of authorities under different facts, and where the question has been properly raised, would do little good here.

7. Buchhalter and Myers, especially the latter, comment vivaciously on each other's frailities and poor business abilities. They do it with unrestrained fervor, in person and by attorney. But whither bound? What shall be the judgment? We cannot equalize the gifts of nature, whether shabbily or lavishly bestowed. Buchhalter filed no cross-complaint against Myers; so there can be no judgment on that, and Myers assigns no cross errors except those that pertain to extraneous matters. A decision as to their relative business capacities might be complimentary or otherwise, but this would be all.

We say these things only because of the fact that a vast part of the evidence, and much of Myers' brief, pertain to matters concerning the exercise of business judgment, good or bad. The mere exercise of poor business judgment, if it was that, does not necessarily give rise to a cause of action in an application for the appointment of a receiver and for an accounting.

8. Some of the designations used by Myers through his counsel to indicate the directors, are surprising. Such terms used by him as "hand-picked directors," "dummies," "conspirators," and other appellations of similar import, all combined can do little else than afford a rather picturesque display window for the accuser's imperfections, considering the fact that Myers helped select that kind of men, if such they are. Every man who sat as a director when this suit was brought owed his office in part to Myers' vote. We dislike to believe that Myers helped to perpetrate a fraud on himself and the public by choosing such unworthy representatives. We are convinced that he is mistaken. Some of them are honored members of the legal profession, against whom the charges were so unfounded that not even nominal damages were awarded. The trial court, in a minute analysis of their motives, mentioned the fact that they had no interest in the company's welfare, although some of them were attorneys for holders of the $250,000 bond issue, secured by first mortgage on all assets of the company. The learned judge concluded from this that they were thus protected. The reasoning, however, stopped before it was completed, for it would be a strange mortgagee, or attorney, who would plan or even consent to fraud or mismanagement that would batter the value of his own security. We notice a stipulation, for instance, a result of the receivership, that receiver's certificates may take precedence to the extent of $10,000 over the bonds. And even if the directors had no incentive by their financial representation, it would be an innovation in corporate management for a court to oust a director from office on

the ground that he held only one share of stock in the corporation. We cannot approve of such a reason.

9. One of the reasons for the action of the trial court appears to have been a belief, there entertained, that the directors got their authority by virtue of an illegal voting trust. Such a conclusion was a mistake, because whether the instrument is valid or not, the directors were chosen according to statute. The directors for the first year of the pulp company's corporate existence were named in its articles of incorporation, as provided in the eighth paragraph of section 2243, C. L. 1921. Two of the incorporators were Buchhalter and Myers. Section 2263, C. L. 1921, provides, inter alia: "And when any vacancy shall happen among the directors or trustees, by death, resignation or otherwise, it shall be filled for the remainder of the year as shall be provided by the by-laws of said company." The company by-laws provide that "Vacancies among the directors or officers may be filled at any meeting of the board of directors." This by-law was adopted by unanimous vote at the first meeting of the directors. Buchhalter and Myers both were present and assisted in its adoption. Various resignations occurred from time to time; successors were elected according to by-law, some of which elections were participated in by Myers. The directors were thus statutory directors. The corporation will never again act as a going concern because of a stipulation that its assets will be sold under court order. On account of the fact that the voting trust, whatever its purport, never actually controlled and never will, a full discussion of the law of voting trusts is unnecessary, but the subject cannot be wholly ignored, for the alleged invalidity of the voting trust threads the entire case. Throughout various orders of the court, including the final order, and elaborate briefs of counsel on both sides, it is indisputable that the voting trust was regarded as so obnoxious by the trial court, that in consequence it materially contributed to a result against Buchhalter that we cannot but regard as inequitable.

The attempt of Myers' counsel to make out that the directors owed their offices to such voting trust resolves itself into nothing in view of Myers' own actions. To declare the acts of the directors illegal on the ground that they owed their official life to the voting trust was error. The statute and by-laws, which Myers' counsel argue are paramount, were followed as we have shown. The voting trust, which he now despises, was not their source of power, although the statutory action was not inconsistent with the terms of the voting arrangement. If Myers' counsel is right in his denunciations of the voting trust, its very insignificance eliminates it, and leaves the statutory selection supreme. And if right that the voting trust was a source of injury, it circles back to the fact that Myers signed that too, which cheapens his objection to it.

It is conceded that the decisions of courts on voting trusts are not harmonious. There is a discussion on the subject by Mr. Justice Campbell in *People v. Burke,* 72 Colo. 486, 212 Pac. 837, 30 A. L. R. 1085. We limit our observations here to pointing out the fact that whether the agreement was valid or invalid under any condition, it was given a place of importance in the determination of the issues by the trial court that it did not deserve, because never operative.

10. Now another problem is, why a judgment for the par value of some of the bonds with interest thereon should have been entered against Buchhalter in favor of the pulp company in a suit by Myers, when the pleadings show that he, as well as all defendants, consisting of Buchhalter, the pulp company, its corporate directors, and The International Trust Company, trustee under the bond issue, that is, each of the parties to the suit, either pleads or admits that the full $250,000 issue of such bonds, and interest thereon, are outstanding obligations against the pulp company. The anomalous result is, that in so far as the judgment against Buchhalter for the supposed value of some of these bonds and interest there-

on is concerned, it is in favor of the admitted debtor, the maker of such unsatisfied bonds, namely, the pulp company. Regardless of who the bond creditors are or may be, such a judgment is obviously wrong. If the pleadings were due to a "conspiracy," as Myers' counsel may say, it was truely all-embracing, including Myers himself. These outstanding obligations, and the company's inability to take care of them, and meet the interest installments, formed leading grounds of Myers' suit and application for a receivership. His cause is not aided by the departure in his amended complaint, filed at or near the close of the trial, wherein he reversed himself and claimed that some of the bonds were the property of the company. The judgment for the so-called value of the bonds and interest was wrong.

11. The cancellation of 2,500 shares of preferred stock issued to Buchhalter was error. It was issued to him for value equal to the par of the stock. Incidentally, it appears to have discharged a debt of the company to Block, and finally a payment of a debt that Block owed Buchhalter. It reduced the pulp company indebtedness to Block, but the fact that Block thereafter paid Buchhalter or any one else is carrying the inquiry too far. He could do as he chose with his own. That it was a legitimate transaction is recognized by the court; the decree provides that the amount paid, $2,500 shall be credited on the judgment against Buchhalter when he surrenders the stock, but the credit on a judgment under which we hold that he is not bound, does not aid him. Such cancellation must be set aside.

12. Concerning 3.5 per cent of the judgment, or $607.71, relating to post-corporation affairs: $250 of this amount was for a salary paid by Buchhalter to himself, not authorized by the board of directors. $357.71 of it was on account of gas and oil paid for by the pulp company, and used in Buchhalter's automobile. Counsel for Myers speak sarcastically of the gas and oil item, but leave it to us to extract from a record of wearisome length, the tes-

timony that Buchhalter claimed the amount as used in the company's business, while going to and from the mill, although he used his own automobiles. Regardless of the value of the testimony, counsel was unfair to himself and to the court, earnestly seeking the facts. It was not legitimate argument.

13. A study of the record affords further light on the $607.71 item incorporated in the money judgment. G. C. Hankins, a witness on behalf of plaintiff testified that in April, 1926, he made an examination of the pulp company books. This was the month before the suit was commenced. He also examined the company books after the suit was brought. He reported to Morris and Myers; he was given free access to the books; he was told by them to look up matter to substantiate the complaint, and this is what he did, absolutely, according to his testimony. Myers as a director and stockholder also had right of access to the books. If he was refused, our attention has not been called to it. If the $607.71 item was wrong, it could have been easily discovered. It did not require the appointment of a referee to take an accounting to find it, and the costs of reference were assessed to Buchhalter. A simple action at law would have sufficed, if the expense was improper, without the frightful costs attendant upon this case. The record contains 6,452 folios, besides exhibits. It pertains largely to matters foreign to the complaint, and other matters that were purely business transactions, on which the court found no basis of a money judgment against Buchhalter. The procedure adopted alone condemns it. An equitable accounting was unnecessary. We cannot allow it when under such circumstances there was a full, complete and adequate remedy at law.

14. Speaking of Buchhalter in his capacity as a director of the pulp company, which office he assumed on June 2, 1925: This position made him a trustee for the stockholders; the principle is stated frequently in the

brief of Myers' counsel, but no one denies this hornbook proposition. We have often decided it, and sections 2263, 2264, 2267, 2268, 2270 and other sections of C. L. 1921, speak of the "board of directors or trustees," or "directors or trustees," constantly using the two words interchangeably. The very nature of the office signifies its meaning. The lack of discrimination, however, as we view it, lies in counsel's conception of the word, particularly as to the province of the court to interfere with purely business functions of the trustee—common prerogatives of merchants—and in confusing them with matters which should properly exercise the mind of the court. There is a vast amount of testimony as to which was the best place to buy rags and rag paper for the pulp company mill in competitive markets, but in general these are business matters. Courts have little or no right to interfere with men's freedom of will, when they do not violate law or the rights of others. If the situation were as bad as Myers' counsel paints it in declaring that Buchhalter squandered thousands of dollars of the stockholders' money, no doubt there would have been a money judgment against him for it, failing in which, we are reasonably confident that counsel would have assigned it as error. We must dispose of the assertion as rhetorical.

15. We shall endeavor to make clearer our position in another matter. We have pointed out that Myers participated in the selection of the pulp company board of directors. We are not to be understood as saying that because he did so participate, he is therefore estopped to question their official acts. We do say, however, that he is not in a position to question the manner of choice of directors. He cannot fasten on others the blame for his own acts, or for acts in which he freely participated. As to the voting trust, also Exhibit 1, and pre-corporation matters, if they are as vicious as Myers' counsel declares, he does not come into equity with clean hands. If they broke the law, the answer is that the chancellor should

not listen to the plea of an outlaw for a larger share of booty than he had been able to wrest from his confederate. We observe again that we do not impugn the parties' transactions, but if the pre-corporation proceedings were valid, plaintiff has no cause of action as to such, and if invalid, he is just as poorly off.

16. Courts should not make new contracts for parties. It would result in filching the property or property rights from one man, and donating them to another. See *Sunset Oil Co. v. Whistleman,* 77 Colo. 570, 237 Pac. 1116; *Gertner v. Limon National Bank, supra,* (82 Colo. 13, 41); *Seitzinger v. Modern Woodmen,* 106 Ill. App. 449, 457, affirmed in 204 Ill. 58, 68 N. E. 478.

17. The impossibility of restoring the status quo of the parties forecloses plaintiff. *Rubie Combination G. M. Co. v. Princess Alice G. M. Co.,* 31 Colo. 158, 161, 71 Pac. 1121. It is not without significance that plaintiff waited until after the fruits of Buchhalter's labors, and the money belonging to himself and his friends were impounded in a corporation of which plaintiff was the majority stockholder, before he applied for judicial relief as to pre-corporation matters. He waited too long.

18. The costs of George W. Beck, the receiver, are charged to Buchhalter. It is impossible to determine the extent to which this goes, as the receiver's report is not before us, but the assessment of such costs, or any other costs against Buchhalter was error. The receivership matter has gone so far that a revocation of the original appointment would do no good. In consequence, the parties have stipulated that such original appointment will not now be challenged, and the pulp company property will be sold at judicial sale, and jurisdiction in the district court shall be retained for such purpose. The parties have, however, further stipulated that such action shall not preclude them from litigating the matters in controversy here. One of these matters is the receiver's costs.

This consideration moves us to say that a receivership is not a panacea for all business ills. The remedy may be worse than the disease. Even the suggestion of a receivership, as all know, may cause capital to hide in its shell. We should be loath to curtail a nisi prius court in a proper case, but this extraordinary remedy should be exercised with the gravest of caution. The mere fact that a business may be losing money for a time, is not necessarily in itself a ground for a receivership. If it were, we fear that most of our industries would be manned sooner or later with court officers, tantamount to industrial slavery. Myers applied for the appointment of a receiver while the pulp company was in its infancy, then only about a year old. The manager, Block, was a man whose $500 per month salary had been unanimously approved at a directors' meeting in which Myers participated. The fact that a corporation or person owes a debt is not in itself a ground for a receivership. *Pomeranz v. National Beet Harvester Co.*, 82 Colo. 482, 486, 487, 261 Pac. 861. That situation alone might indeed constitute a very bad reason, as depriving a debtor of his source of livelihood and ability to discharge the debt. Whatever other grounds there may or may not have been, the fact that Myers concluded to breach his contract after Buchhalter and his friends had helped start the pulp company was not a good reason. It meant performance and additional performance by Buchhalter, but a breach by Myers while the latter kept the fruits of his contract and obtained even more than that for which he had bargained. Matters not pleaded were not valid grounds. We have not overlooked Myers' assertion of fraudulent conduct after the formation of the pulp company, but this question has been disposed of.

19. Shortly after the appointment of Beck as receiver, the court authorized the issuance of receiver's certificates in the sum of $50,000. They were to be in two series of $25,000 each, and were declared to be a lien upon the corpus of all the property, real and personal of defend-

ant pulp company, but subordinate to existing mortgages of record and liens for taxes. It is not to be understood that this was charged to Buchhalter personally, but it was error to assess any costs or expenses of the receiver or otherwise against him.

20. No doubt part of the money spent by the receiver was used in the operation and maintenance of the plant, except that which was allowed by the court for the receivership machinery. Some of these items are as follows: $500 per month to Beck as receiver, and $2,000 to him in addition to his per month allowance. This record does not disclose how much time Beck was required to or did devote to the business of the pulp company. $2,000 was allowed to Charles Ginsberg, attorney for the receiver. The Beck and Ginsberg allowances were ordered less than two months after the receiver had been appointed. The order of allowance on July 9, 1927, in their favor provides: "The Court reserves authority to make such further allowances as may appear just and proper." $500 was allowed to Clifford J. Gobble, as special attorney for the receiver. $500 was ordered to be paid Henry Behm, referee for the accounting, but it pertained first, to matters not in issue, and second, to matters that could have been ascertained without an accounting. The last named allowance was by stipulation, without prejudice to defendants' objections to appointment of a receiver or to the accounting ordered.

The receiver's report of receipts and disbursements is not before us, but even if the full proceeds of the $50.000 receiver's certificates had been used exclusively in the maintenance and operation of the paper mill, it would have been a comfortable sum to have had available for use as a going concern without a receiver, and to defray some of the current bills of the company. The above items are selected at random from the record; we do not pass upon their validity, but we suggest that counsel for Myers may find fruitful employment for their adjectives in the study of the receivership question. We do not

here take into account the prodigous costs of this suit, nor the money that it must have cost defendants in its legitimate defense.

21. When it is declared that Myers lost money in the pulp company, it may be said in the next breath that Buchhalter and his friends cannot but be disappointed also in the failure of a cherished enterprise. Nevertheless, we think every man knows that the steel engraving or lithograph and gold seal on a bond or stock certificate laid away in a tin box may be eloquent only of a secret sorrow. It does not follow, however, that equity affords a balm in every instance. A receivership may be only an aggravation.

22. Without warning or antecedent pleading concerning a pre-corporation trust, plaintiff's counsel created a nebulous trustee, but promptly annihilated him for breach of trust, and chastised him with the expense of a referee and costs of the parties and a receiver, all in one case. It has no precedent and is repugnant to our sense of justice.

The judgment and decree will be reversed in all parts, except that jurisdiction over the receivership will be retained in the district court in accordance with the stipulation of the parties, and for further action not inconsistent with this opinion. All costs and expenses that have been assessed against Buchhalter will be set aside and reassessed to Myers.