### ANDREWS v. DRAKE et al.
#### No. 7185.

Circuit Court of Appeals, Sixth Circuit.
May 8, 1936.

---

[3] See International Business Machines Corp. v. U. S., supra.

A. M. Lowenthal and Stanley Osserman, both of New York City (Abraham M. Lowenthal, of New York City, on the brief), for appellant.

Hal H. Smith and Alex J. Groesbeck, both of Detroit, Mich. (Beaumont, Smith & Harris, Frank E. Cooper, Joseph A. Vance, Jr., Don M. Dixon, and Frank E. Robson, all of Detroit, Mich., on the brief), for appellees.

Before MOORMAN, HICKS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Bill in equity filed March 21, 1935, by J. Walter Drake, a stockholder in the Hupp Motor Car Corporation (hereafter called Hupp), against Hupp and six of its directors, to wit, Archie M. Andrews, Frederick Cardway, Emlen S. Hare, Walton G. Fitzgerald, John McGrath and Frank S. Lewis. Appellant Andrews was the largest stockholder of Hupp and chairman of its board. The suit was a class action on behalf of Drake and all other stockholders and the bill charged, among other things, that the board was under appellant's control and had made or was about to make certain contracts which would be frauds upon the corporation and its stockholders, and that it was in other respects defrauding and mismanaging the corporation.

The specific contracts attacked were: Two with appellant known as the "August 23, 1934, contract" and the "$10.00 per car contract," each for his compensation for certain services on behalf of the corporation in the capacities of business adviser and general sales manager respectively, each containing options to appellant for large purchases of treasury stock even in the event Hupp should be merged with another corporation; one with Frederick Cardway, another director, for the right to sell Hupp cars in foreign countries, a contract which it was alleged would give him an unfair advantage and in which appellant was to have a secret interest; one with the Automobile Ownership Survey, Inc., a corporation owned or controlled by appellant, giving it a commission of $65 for each car sold to buyers whose names it had supplied; and a contract with the Seminole Paper Company, manufacturers of toilet paper, by which Hupp was to donate free a large number of its automo-

biles as prizes in an advertising contest of the Seminole Company, in exchange for incidental, advertising inuring to Hupp.

In addition it was charged that appellant through his dominion of Hupp had so destroyed its credit that its suppliers were denying credit and were making shipments upon a C. O. D. basis only. The plaintiff (appellee here) sufficiently met the requirements of Equity Rule 27 by an allegation that no appeal had been made to the board of directors to remedy conditions, since appellant's domination thereof rendered it useless, and that lacking access to the list of stockholders, it was impossible to act through them.

On March 29, 1935, appellee filed an amended bill which averred that Andrews had changed the board of directors so that, as then constituted, its personnel was largely different from that elected at the last annual stockholders' meeting. This amended bill set forth the proceedings of an investigation initiated by the listing committee of the New York Stock Exchange looking to the delisting of Hupp stock; and an alleged attempt by appellant to throw Hupp into receivership.

On April 8, 1935, appellee filed a supplemental bill in which he prayed for the appointment of a receiver for Hupp, based upon the allegation that through the influence of appellant there had been on April 1, 1935, a wholesale discharge of officers and employees. This supplemental bill also averred that appellant and other directors had failed to testify before the stock listing committee of the New York Stock Exchange when requested to do so and that these acts of mismanagement in connection with other matters were demoralizing Hupp's employees, sales organization, and credit.

On April 16, 1935, Hupp, through its then attorneys, Schein and Culver, filed an answer verified by its vice president, which admitted the existence of the contracts involved, but denied that they were fraudulent and declared that the discharge of certain disloyal employees was necessary and that failure to appear before the committee of the Stock Exchange was not without excuse; that Hupp's production was on the increase and that satisfactory arrangements with suppliers of materials were being worked out.

Appellant entered his appearance on April 16, 1935, through his attorney, Culver. Although Hupp had lost upwards of $15,000,000 since the beginning of the depression in 1930, it had met its losses out of surplus and even as late as April, 1935, it owed no money except for current debts and its plants and equipment were unincumbered. Because of its sound financial condition District Judge Moinet declined to appoint a receiver and urged the parties to work out an agreement whereby their differences would be composed and Hupp would continue to function, after which he indicated that he would dismiss the suit.

Upon Judge Moinet's suggestion, negotiations were had in which appellee and his counsel, Mr. Smith, Mr. Groesbeck, representing Hupp, and appellant and Schein and Cohen, his attorneys, participated. Schein and Cohen asserted that they were also acting for Hupp. As a result of these negotiations, it was finally agreed on May 7, 1935, that the board of directors should be composed of the following members, namely, Andrews, Drake, Groesbeck, Smith, Drum, Lewis, Merriam, Campbell and Mayo; that Drum should become president; that the contracts between appellant and Hupp should be submitted to the new board, and that if appellant was not satisfied with its action thereon, they would be referred to Judge Moinet as arbiter for final decision; that the Cardway contract was likewise to be submitted to the new board, and that no new litigation was to be commenced involving the matters in suit or challenging the settlement agreement. This agreement was not put in writing, but it was thoroughly understood; and the decided weight of the evidence is that it was further understood that when the operations of Hupp under the management of the new board were well under way, the pending litigation should be dismissed. To give effect to the agreement, certain members of the old board of directors resigned, and certain of the new were elected in their places. Drum was elected president and appellant resigned as chairman of the board. The new board proceeded to function, and immediately abolished the office of chairman. Appellant sat with the new board as a member and engaged in the discussions, and in voting until May 21, 1935. Previously, on May 13, at an adjourned special meeting, the board canceled and abrogated the purported contracts between appellant and Hupp. Appellant soon adopt-

ed a hostile attitude. He repudiated the agreement of May 7; he had as early as May 17, 1935, caused meetings of the old board to be called and presided over them as chairman. He represented to divers interested persons and organizations that the members of the old board were still directors. He brought or caused to be brought various lawsuits in various jurisdictions and for various purposes. It is unnecessary to follow the course of these proceedings in detail. It is manifest that his purpose was to harass and annoy the new board and regain dominion and control of Hupp and in the end to assert and establish the contracts that had been abrogated.

On June 4, 1935, appellee filed a second amended bill in which he set forth the negotiations leading up to the agreement of May 7; the organization and operation of the new board thereunder; and the antagonistic activities of appellant and those associated with him, including his counsel, all of whom were made parties; and was granted appropriate interlocutory, injunctive relief. Hupp filed its answer to this second amended bill and admitted the substantial allegations of all the bills and joined in their prayers for relief. Hupp's answer was signed by Drum, its president, and Groesbeck, its attorney. Disclosures had convinced Groesbeck that the true interests of his client were identical with those of appellee. It is urged that this second amended bill is in fact a suit for the specific performance of the agreement of May 7 and therefore renders the averments of the original and first amended bill absolutely moot. There is no merit in this contention. The second amended bill is in the nature of a supplemental bill based upon matters occurring after the institution of the suit which do not in any way change the rights or interests of appellee, but which support those rights and interests as they were averred in the original pleadings.

On June 28 appellant answered all the bills, asserted that the challenged contracts were valid, averred that appellee's suit was for the sole purpose of harassing him and the corporation, substantially admitted the agreement of May 7, asserted that he had entered into it in good faith, averred that appellee had entered into it for the sole purpose of gaining control of the corporation, and, in all other particulars, denied the averments of the various bills.

Thus the case was finally brought to issue. Judge Moinet struck from the files an affidavit of bias and prejudice, but transferred the case for trial before Judge Tuttle of the same District. Judge Tuttle overruled appellant's motion for a continuance and after a protracted trial rendered an oral opinion to the effect that the allegations of the various bills had been sustained, but before the findings of fact were filed he permitted appellee to file a second supplemental bill in order that the pleadings should conform to the proof, that while the trial was in progress the annual meeting of the stockholders of Hupp had been held at Richmond, Va., at which meeting Mayo, Drake, and Merriam were duly elected as directors for a three-year term, and the previous election of Drum, Smith, and Campbell ratified; and all the acts of the board of directors as newly constituted on May 7, 1935, and especially those in furtherance of the agreement on May 7 ratified, approved, and confirmed.

Hupp answered this second supplemental bill and admitted its averments. These averments were germane to the original pleadings. The final decree adjudged that the purported contracts of August 23, 1934, and March 19, 1935, were null and void; that the May 7 board of directors was validly elected; and that the annual meeting of stockholders of Hupp in September, 1935, at Richmond was validly convened and held. The decree enjoined appellant from beginning or prosecuting any other actions involving the issues decided and ordered an accounting and referred the cause to a special master to hear proof and report with respect to moneys·which appellant had at various times obtained under the purported contracts or otherwise wrongfully extracted from Hupp.

It must be kept in mind (1) that this being a class action, appellee's suit was in effect on behalf of Hupp [Wolfes et al. v. Paragon Refining Co., 74 F.(2d) 193, 199 (C.C.A.6)]; and (2) that decrees are based upon issues and that proof as to all other matters is irrelevant. When these fundamental principles are observed, the case falls within rather narrow limits.

The history of Hupp and its management prior to the time the cause of action arose, the motives which impelled appellee to sue, and the loyalty or disloyalty of the new board of directors, are beside the point. The issue is, whether the contracts

involved were fraudulent and void, and whether appellant as an officer and director had mismanaged Hupp's affairs to his personal advantage and aggrandizement.

On August 23, 1934, appellant, who was then a director, had an agreement drawn up between himself and Hupp by which he was constituted business adviser, his duties thereunder being "to counsel with the General Manager and other officers of the Second Party when called upon to do so, to give them the benefit of his best judgment and advice and to devote as much time as may be required for the performance of those duties. * * *" His employment was to continue for eighteen months and was to be extended an additional four years if his services were satisfactory. He was to be paid at the end of each year, out of that portion of the net profits of Hupp earned during the year exceeding $1,000,000, a sum equal to 6 per cent. of the first $2,000,000 thereof; 5¼ per cent. of the next $1,000,000 thereof; and 4½ per cent. of all additional net profits earned in such year. The contract contained a further provision that Hupp should grant to appellant an option to purchase 100,000 shares of its common treasury stock at the price of $2.50 per share; that he should be entitled to exercise the option to the extent of 50,000 shares when and if the operations of Hupp should have been at a profit for any period of six months during his employment; and that he should be entitled to exercise the option as to all of the stock yet untaken when, during his employment, Hupp should have earned a profit of $1,000,000. It further provided that in the event of a merger of Hupp with one or more other corporations appellant should be entitled to exercise his option irrespective of the earnings of Hupp.

The Hupp charter prescribed that such a contract with a director should not be valid unless it "shall have been adopted or authorized by a vote of at least a majority of the whole board of directors not interested in any wise therein or shall have been ratified and approved by the affirmative majority vote of the outstanding capital stock of the corporation. * * *" The whole board consisted of nine members. The contract was considered at a meeting of eight directors. Appellant and Cole, another director who was then interested in a somewhat similar agreement, did not vote. Four voted for the contract. It is obvious, therefore, that it was not approved by either a majority of the whole board or even by a majority of those present.

About August 31, 1934, appellant caused the board as then constituted to issue a notice of the annual meeting of stockholders and a form letter which was sent with the notice. Each of these documents purported to describe the contract, but they made no reference to the provision whereby appellant was granted the right to exercise the stock option in the event of a merger. The notices sent to the stockholders in anticipation of the annual meeting contained a statement that appellant (not mentioned by name, but undoubtedly referring to him) upon ratification of the agreement would not insist upon a salary, and appellant himself made a similar statement at the meeting. At the annual meeting on October 18 the motion to ratify and approve the contract received only 595,268 votes out of 1,326,128 of the total issue. This was not an "affirmative majority of the outstanding capital stock of the corporation. * * *"

Appellant's associates on the board of directors who were made defendants herein made no attempt to sustain this contract. They in fact made no defense whatever to the suit. Appellant himself seeks to uphold it by pointing out that the contract itself contained a clause that it should be "ratified at the next annual stockholders' meeting by a *majority vote of the stock voting on such ratification*" (italics ours), but the parties could not of course set aside the charter provisions by an agreement to ignore them.

On October 19 at the first meeting of the newly elected directors appellant insisted that he not only be elected chairman of the board, but that he be paid a salary of $3,000 per month. There were two sets of minutes of that meeting, one showing that he was simply elected chairman and the other that he was elected chairman at a salary of $36,000 per year, but that he accepted the office without salary until he could have legal advice as to whether he could receive it. The minutes of the board meeting of December 7, 1934, show that it was voted to change the minutes of October 19, so as to show that appellant had been voted a salary of $3,000 per month, and appellant again stated that he refused to accept the salary, although he had twice theretofore drawn drafts on

Hupp for $3,000, which the treasurer had dishonored.

We think it sufficient to say that the contract of August 23, 1934, is not only invalid because it was never lawfully .adopted by the board of directors or ratified by the stockholders, but because the provision continuing appellant's right to exercise the stock option in the event of a merger was concealed from the stockholders. The circumstances in connection with the subsequent developments indicate. deliberate concealment.

In September, 1934, the attention of the New York· Stock Exchange was called to this contract. The stock listing committee of the Exchange inaugurated an investigation. Early in January the committee indicated that the Andrews contract should be canceled. It pointed out that the stockholders had not been advised, prior to their annual meeting, of the unusual provisions in· regard to appellant's option in the event of a merger. The contract was later brought to the attention of the Securities and Exchange Commission at Washington, which found that in its opinion "the failure to adequately· describe the contracts for which approval was asked, particularly the failure to mention the acceleration of the option in case of merger or consolidation, were all against good conscience and short of that standard of complete faithfulness which should attend dealings between corporation officers and stockholders, particularly when contracts to which the officers are parties involved and stockholders are numerous and widely scattered."

At the January 15, 1935, meeting of the board the recommendations of the listing committee were approved and it was voted to do all things necessary to put them into effect. Appellant then submitted a new form of agreement known as the "$10.00 a car contract," by the terms of which he was to be placed in sole charge of sales and advertising; was to be given an option upon 100,000 shares of treasury stock at $2.50 per share, with certain cancellation rights in case of a merger or consolidation; was to be given two drawing accounts, one of $1,500 and another of $300 per month, and $10 for each Hupp automobile sold in excess of 10,822, ·which compensation was not to exceed $50,000 unless Hupp should have made a net profit during the calendar year. This new form of contract was submitted to the board on March 19, 1935,

with seven ·directors present out of a total of nine. Four directors voted to approve that portion pertaining to appellant's employment, his compensation and the drawing accounts. This vote lacked the necessary majority as prescribed by the Hupp charter. A motion was made to approve that portion with reference to stock options, but was withdrawn, and the minutes of the board do not disclose that it was ever approved.

This contract was never legally operative, yet appellant insisted that it was, drew $1,500 per month for four months upon the strength of it, and then undertook to assign his rights in it to his brother, who brought suit against Hupp for compensation claimed to be due thereunder.

All of the stock of the Automobile Ownership Survey, Inc., was owned by appellant. In the fall of 1934 this company made a contract with Hupp whereby it would collect the names of prospective purchasers of cars. The Survey Company would give a cigarette lighter to each person sending in such a name. These lighters were purchased by the Survey Company from a company owned entirely by appellant and were paid for by Hupp. If a salesman using one of these names effected the sale of a car, the Survey Company would receive $65 from the dealer as a commission. In addition, there was substantial evidence that the Survey Company received large amounts from Hupp between September, 1934, and February, 1935, which were spent by the Survey Company in connection with various activities in which Hupp had no interest whatever.

The Cardway contract: The undisputed testimony is that in January, 1935, while Cole, Cardway, and appellant were members of the board of directors, Cardway proposed, in a written memorandum, to handle all of Hupp's exports on a percentage basis per car. Appellant proposed to Cole that if such an agreement was made an export corporation would be formed to take over the contract with Cardway as president and Cole as vice president; that appellant was to own 50 per cent. of its stock and Cardway and Cole 25 per cent. each; that appellant told Cole if he would vote for the contract and influence one other director to vote for it, Cole would receive a salary of $25,000 from the new corporation and a share in its profits. Cole refused, but the minutes of the board meeting of February 7, 1935, revealed that the

o

officers of the corporation were empowered to execute a contract granting Cardway the exclusive right to sell Hupp autos in all parts of the world, except the United States and Canada, upon such terms and conditions as might be decided upon and approved by the executive committee of the board (then composed of appellant, Lewis, and L. A. Hebert). Figures were presented to the meeting showing that the average export cost during the past five years had been 21.84 per cent. of the dealer's net prices. These figures were highly misleading, since in 1934, with sharply mounting sales, the export cost had dropped to 8.5 per cent. thereof, and even in 1933 were less than 10 per cent. of the sales. The contract as drawn gave Cardway exclusive right to handle the export business; he was to take care of all advertising, was to obtain the cars at the regular dealer's discounts and at the end of the calendar month was to receive 10 per cent. of the proceeds to the manufacturer of all sales made in the exporter's territory and an additional 3 per cent. of the amount by which gross sales of Hupp in the contract year in the exporter's territory exceeded the gross sales therein in 1934.

This contract was approved by the executive committee and ratified and confirmed by the board of directors at its meeting of March 19, 1935, appellant voting in the affirmative. The contract was rejected by the new board of directors on May 13, 1935, but the circumstances surrounding the transaction indicate the utter disregard of appellant and other members of the old board for the true interests of Hupp.

Much has been said touching the Seminole Paper Company contracts. We dispose of them briefly.

While appellant was chairman of the board he executed, on behalf of Hupp, an agreement with the Seminole Company, a manufacturer of toilet paper, to deliver to it in 1934 thirty Hupp cars free of charge, to be used as prizes in a contest conducted by the Seminole Company as a means of advertising its product. He later signed, without authority, two other contracts for a total of three hundred cars. It was supposed that the use of the Hupp name in the advertising of the toilet paper contest would be of compensating benefit. The minutes show that these contracts were ap-

proved by the board of directors on March 19, 1935, but the decided weight of the evidence is that they were wasteful and worthless, costing Hupp more than $50,000; and that the contest was vulgar in its nature, offended common decency and that the association of the name of Hupp therewith was rapidly bringing it into disrepute. There is further evidence that appellant in order to create the impression that these contracts were advantageous to Hupp, actually solicited from dealers false statements to the effect that they were finding the advertising of great value to them. The record is replete with evidence of waste and mismanagement by appellant in other particulars which we think it unnecessary to discuss in detail.

Appellant insists that the court erred in decreeing that Groesbeck, Smith, Drake, Merriam, Campbell, Mayo, and Drum were valid directors and in entertaining jurisdiction to adjudicate their title to office. The point is without merit. It must be kept in mind that this is a stockholders' suit against the old board of directors and against appellant in particular for mismanagement of its affairs in violation of their duties as trustees. It is not primarily a contest between rival boards of directors. The court undoubtedly had jurisdiction (Mayer v. Oxidation Products Co., 110 N.J.Eq. 141, 159 A. 377) and it is a fundamental principle that equity having jurisdiction for one purpose will take jurisdiction for all purposes germane thereto. "Equity delights to do complete justice and not by halves." It will do what is necessary to grant relief as between the parties. It was within the province of the court to establish the validity of the new board of directors in order that its decree might be complete and that the relief granted might not only become but remain effective. Chicago Macaroni Mfg. Co. et al. v. Boggiano, 202 Ill. 312, 67 N.E. 17; Hall v. Woods, 325 Ill. 114, 136, 156 N.E. 258; Nathan v. Tompkins, 82 Ala. 437, 447, 2 So. 747. Moreover, as heretofore pointed out, appellant fully and completely recognized the validity of the new board as organized on May 7, 1935, and is therefore not now in a position to challenge the procedure by which they were elected. Buchhalter v. Myers, 85 Colo. 419, 276 P. 972. No other member of the old board undertakes to challenge it by any appropriate pleading.

Appellant indulges in criticism of Judges Moinet and Tuttle. He insists that

774

due to their bias and prejudice against him an unfair trial resulted.

■ As to Judge Moinet, it is sufficient to say that he did not try the case. The trial continued for four weeks, resulted in a record of 2,346 pages and a large number of exhibits. Judge Tuttle presided under unusually trying circumstances. We have examined the rulings of the court upon which appellant's charges of unfairness were based, and we do not undertake to discuss them in detail. In our opinion these matters do not affect any substantial right of appellant. In equity cases this court makes its own decree and we are unauthorized to strike down an otherwise valid decree because appellant is discontented with the attitude and conduct of the trial judge. See Ex parte American Steel Barrel Co., 230 U.S. 35, 44, 33 S.Ct. 1007, 57 L.Ed. 1379.

■ There were 298 assignments of error. We have undertaken to review those which are substantial. The remainder, constituting by far the larger number, might well be dismissed outright because they are not discussed in appellant's brief as required by our rule No. 20. See Kahn v. United States, 20 F.(2d) 782 (C. C.A.6). These assignments for the most part deal with the admission and exclusion of testimony, but as in all equity cases we have reviewed the entire record, and have given no weight to impertinent evidence. The assignments based upon the exclusion of testimony bring nothing to our attention because of failure to preserve the rejected evidence. We are therefore unable to determine whether if received such evidence would have required another result.

The decree is affirmed.